CHARLES LEE KELLEY ET AL.

vs.

VERNON W. STANTON ET AL.

*Will—Competency of Testator—Evidence—Undue Influence—Opinions.*

The return of an inquisition in proceedings in which, more than two years after the execution of the will in question, the testator was adjudicated to be of unsound mind, was admissible, though insufficient to show mental incapacity at the time of the execution of the will, in the absence of evidence connecting his mental condition as disclosed by the inquisition with a want of capacity at the date of the will.    pp. 383, 384

Objection to prayers on the ground that there is no evidence sufficient to support the hypotheses of such prayers, must be made in the form of a special exception.                p. 385

That testator's brother-in-law, father of the sole devisee, instructed the draftsman of the will as to its contents, out of testator's presence, did not show that the will was executed under undue influence, in view of evidence that the draftsman lived ten or twelve miles from the testator, and that as the devisee's father lived near such draftsman and frequently visited testator, it was convenient for testator to have the devisee's father have the will drawn and to bring it to him on one of his visits.                              pp. 390-393

That testator, a bachelor, devised all his property to the son of a deceased sister, with whose husband he was on intimate terms, did not justify a finding of undue influence, especially in view of the testimony of the caveators, his brothers, that he had at different times offered to leave his property to one of them, to one of their children, and to one of their wives.
                                            pp. 392, 393

A non-expert witness, though he has had a sufficient opportunity of observing the conduct and appearance of the testator,

cannot arbitrarily express an opinion as to his testamentary capacity without the disclosure of any facts or reasons for the opinions which he may have formed from such observation.

pp. 393-396

The opinion of a witness, based on facts of a vague and trivial nature, that testator was mentally incompetent, and evidence of various witnesses that he was in some ways peculiar, together with the return of an inquisition, made more than two years after the execution of the will, by which he was found to be incompetent, but without any evidence that his mental condition existing at the time of the inquisition extended back to the time of the execution of the will, *held* to be insufficient to show a lack of testamentary capacity at the earlier date.

pp. 396, 397

*Decided June 23rd, 1922.*

Appeal from the Circuit Court for Dorchester County (BAILEY and DUER, JJ.).

Petition and caveat by Vernon W. Stanton and others as to the will of Charles V. Stanton, deceased. From rulings in favor of the caveators on the issues of mental competency and undue influence, the caveatees, Charles Lee Kelley, sole devisee under the will, and John F. Stanton, executor, appeal. Reversed.

The cause was argued before BOYD, C. J., PATTISON, ADKINS, THOMAS, URNER, BRISCOE, STOCKBRIDGE, and OFFUTT, JJ.

*William N. Andrews* and *V. Calvin Trice,* with whom were *Andrews & Shepherd* on the brief, for the appellants.

*Emerson C. Harrington* and *Leroy L. Wallace,* with whom were *A. S. Marine* and *Harrington, Harrington & Wallace,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Charles V. Stanton was born, for the greater part of his life lived, and finally died, in Dorchester County, Maryland. His death occurred at the Eastern Shore State Hospital September 23rd, 1920, on his fifty-seventh birthday. He was survived by four brothers and a nephew, who were his next of kin and only heirs at law. He was by trade a bricklayer and plasterer and, measured by the achievements of other members of his family having equal opportunities, he appears to have been fairly successful in his business. Starting without capital or resources other than natural skill and industry, he left an estate valued at from six to ten thousand dollars. He appears to have satisfactorily discharged what may be regarded as his obligations to his family and his community. He was attentive to his parents, solicitious of their welfare and careful of their wants; he was a good neighbor and well liked and respected by those with whom he lived in closest touch. He took some part in the usual neighborhood affairs, attended church regularly and occasionally participated in the varied and comprehensive debates at the village store that from time to time enlivened the dullness of village life.

A short time before his death his mind became affected and, on September 7th, 1920, he was found by a jury, empaneled to inquire into his mental condition, to be "of unsound mind and mentally deranged, without lucid intervals of any duration, so that he is not capable of the government of himself or of the management of his estate, and that he has been in such state of mind for several weeks past, without probability of an early recovery of his reason," and his brother, John Stanton, was appointed a committee of his person and estate. On May 3rd, 1918, he executed the will which is the subject of this controversy, in which he bequeathed his entire estate to his nephew, Charles Lee Kelley. After his death this will was admitted to probate in the Orphans' Court of Dorchester County, and letters testamentary thereon granted to John F. Stanton, the executor named

in the will, on September 25, 1920, and on June 28th, 1921, Vernon W. Stanton, Clarence S. Stanton and Grant Stanton, brothers of the testator, filed in the Orphans' Court of Dorchester County a caveat to that will, on the grounds that it was not validly executed, that when it was executed the decedent was of unsound mind and incapable of executing a valid deed or contract, that he did not know or understand its contents, and that it was procured by undue influence and fraud. After the usual pleadings, issues were framed presenting these several objections and transmitted to the Circuit Court for Dorchester County, where they were tried by a jury, which by their verdict found first that the supposed will was not executed when Charles V. Stanton was of sound and disposing mind and capable of executing a valid deed or contract, and second, that it was procured by undue influence. During the course of the trial the caveatees reserved two exceptions to the court's rulings on matters of evidence and one to its rulings on the prayers, and from the rulings embodied in those exceptions this appeal was taken.

The first exception relates to the admission in evidence of the return of the inquisition in the proceedings in which the decedent was, in September, 1920, adjudicated to be of unsound mind. Assuming that the evidence was in proper form (since no objection was made to it on that ground) we find no error in that ruling. *Hutchins* v. *Hutchins,* 135 Md. 401; *Brashears* v. *Orme,* 93 Md. 442; *Taylor* v. *Cresswell,* 45 Md. 422; *Gesell* v. *Baugher,* 100 Md. 677. The case of *Packham* v. *Glendmeyer,* 103 Md. 416, does not deal with this question. The Court there was passing upon the admissibility of the finding of a jury in an issue involving the testamentary capacity of a testator in connection with the execution of another will than the one involved in that case and rested its decision upon the ground that "judgments and decrees as against those not parties to them are only 'admissible to prove *rem ipsam,* and the legal incidents and consequences' thereof; but 'not to prove the facts' upon which

they are founded," and that therefore the finding of a jury that the testator lacked the requisite testamentary capacity to execute one will did not show that he had not the required testamentary capacity to execute another will at a different time. But in this case the *res ipsa* found by the inquisition was the mental condition of the testator at the very time the will was made. *Davis* v. *Calvert*, 5 G. & J. 300; *Harris* v. *Hipsley*, 122 Md. 430; 28 *R. C. L.* 100; *Williams* v. *Lee*, 47 Md. 325; *Annot. Cas.* 1915 B. 1009. There are cases which hold that such evidence should not be admitted, but in view of the decisions of this Court that any evidence of the mental condition of the testator, either before or after the execution of the will, is admissible for the purpose of reflecting upon his mental condition at the time the will was executed, this evidence was admissible. It was not, however, conclusive, but its force and effect depended upon the other evidence in the case, and in the absence of evidence connecting the mental condition of the testator as disclosed by the inquisition with a want of testamentary capacity at the date of the will, the inquisition alone would be insufficient to show such incapacity.

During the examination of Grant Stanton, one of the caveators, he was asked by council for the caveators this question: Basing it upon your knowledge and association and experience and observations—all you have said—will you please state whether or not in your opinion your brother at the time of the execution of this alleged will was of sound and disposing mind and capable of making a valid deed or contract?" An objection to the question was overruled and the witness answered "no," and that ruling is the subject of the second exception. There was, in our opinion, for reasons given more fully below, error in that ruling, since there was no proper foundation for the question. *Whisner* v. *Whisner*, 122 Md. 204.

This brings us to the third exception, which presents for review the court's rulings on the prayers.

The plaintiffs offered three prayers, all of which the court granted, and the defendants twelve prayers, of which ten were granted and two refused. There was no error in granting the plaintiffs' prayers, as the legal propositions embodied in them have been frequently passed upon and approved by this Court in the form in which they are stated in these prayers. Objection could have been made to them in the form of a special exception, on the ground that there was no evidence in the case legally sufficient to support the hypotheses of such prayers, but as no such exceptions were filed these prayers must be regarded as properly granted. *Lewis* v. *Schlichter,* 137 Md. 217. The defendants' second prayer asked the court to direct a verdict for the caveatees on the second issue on the ground that there was no evidence in the case legally sufficient to show that the testator was not, at the time the will was executed, of sound mind, and capable of executing a valid deed or contract, while in their third prayer they asked that a verdict be directed for them on the third issue on the ground that there was no evidence legally sufficient to show that the will was procured by undue influence. These prayers were refused, and the rulings of the court in refusing them presented the most important questions involved in the appeal. Inasmuch as these two prayers rest upon the theory that, while all the evidence supporting the caveat is true, it is legally insufficient to show either mental incapacity or undue influence, it becomes necessary to review the testimony taken at the trial.

The will was prepared by Elias McAllister, a justice of the peace, at his office at Vienna, at the request of Lee Kelley, the father of Charles Lee Kelley, the devisee named in the will. The testator had not himself spoken to McAllister about the will, although he had seen him a few days before. When Mr. Kelley came to his office at Vienna, which was about twelve miles from Galestown, where Charles V. Stanton lived, McAllister asked him how he wanted the will drawn, and he replied that Charlie (meaning the testator)

said he wanted Kelley's son to have all he had. After the will was drawn it was turned over to Mr. Kelley, who took it to Charles V. Stanton. After keeping it for a while, Stanton sent for Kelley, Senior, and his son to come over to his home. They went over and Kelley, Senior, and the testator drove over to the home of Mr. Thomas Harper at Sharpstown, where the will was executed in the presence of Mr. Harper and Mr. Kelley, Senior, who witnessed it.

The principal witness relied upon by the caveators to establish the fact that the testator was mentally incapable of executing the will was Grant Stanton, a brother. Indeed he was the only witness called by the caveators who ventured to express any opinion in regard to the testator's testamentary capacity at all. He testified that he lived at Portsmouth, Virginia, and had lived there since July, 1908, and that prior to that time he lived at Delmar, in Delaware, except for a period of one year, when they lived on the farm of Charles V. Stanton in Dorchester County, some time in 1915. His mother was Mary M. Stanton and his father Thomas Jefferson Stanton. His mother died in May, 1914, and his father in 1918, and that his father and mother had ten children, of whom four survive, and that with Lee Kelley, a son of Charles Lee Kelley, who married a sister of Charles V. Stanton, who predeceased the testator, they are the nearest relatives and only heirs at law of Charles V. Stanton.

Charles V. Stanton, the testator, was a bricklayer and plasterer. Grant Stanton, the witness, was a railroad man and occasionally, at intervals of several months, visited his brother, Charles V. Stanton, at his home in Dorchester County, except during the year in which he occupied his brother's farm, when he of course saw more of him. His relations with him had always been good and, after their mother's death in 1914, at his brother's request he removed his family from Norfolk to the farm which his brother owned, in order that he would be in a position to look after his brother, who was unmarried, and their father. There was

no written lease, but an oral contract of rental in which Grant Stanton, the witness, agreed to board Charles Stanton and their father and to give Charles Stanton twenty-five dollars a month, and it was further agreed that Charles Stanton was to look after and operate the farm while Grant, whose position required him to be absent so often that he could not run the farm himself, was to get all the produce from it. The witness then went on to say that, after he had been on the farm a while, his brother first offered to will him the farm and he dissuaded him from doing it and then, on another occasion, when they were driving from Seaford to Galestown, the testator said to the witness, "I am going to will it to Bertha," Bertha being a daughter of the witness, and again the witness discouraged him from disposing of his property in that way, and from then on Charles V. Stanton said nothing further to the witness about a will. Some time later, in the summer of 1915, Charles Stanton met him at Seaford "as usual on Saturday and taken me back Sunday afternoon. I noticed he was acting funny, what I would consider about half mad about something or other—on this Sunday afternoon, I said, 'Charlie, if we are going to Seaford, we had better go so that we can get back before night.' I wasn't going to take the train and I was going to stop with a friend. We had plenty of time to get to Seaford and get back before night. On the other side of Cheffel Branch, two miles this side of Seaford, he stopped his horse all at once and said, 'Whoa. Would you mind walking to Seaford?' I said, 'Sure, I would mind it, but I don't want to.' He said, 'I am going back,' and he turned his horse for me to get out. There was nothing for me to do but get out. I had to get out and walk to Seaford, and from that on during that year we had a awful lot of trouble to stay on the farm." This trouble appears to have been that the testator complained that he did not get the rent he expected for the farm and he sat around, would not talk, seem to be "mad" all the time and nothing suited him; he would not eat with the family;

in fact he left and went down town with an old lady with whom he appears to have boarded. For a time the two brothers did not appear to have been on speaking terms, and on one occasion, to quote the witness again, he went out to his brother's home and "found him home and I have not seen him since we had to leave, since we moved. He tried to stop my household goods and said I owed him a lot of money. I asked him why he acted the way he did at the time my wife was moving—I didn't come up to move because I could not get off the middle of the week—his answer was, 'Grant, Lee Kelley is the cause of it all, he told me you would have everything I have got before I died if I didn't get you off the farm.' He started to crying and I talked to him a while. He cried, and, of course, I didn't bother him any more." The witness, at the time the trouble arose, appears to have owed his brother some two months rent. Another incident to which he refers was that in 1910 Charles V. Stanton offered to give the witness' oldest son a watch and, when the witness objected to it, he sold it to the boy for twenty-five dollars. The witness also said that his brother, Charles, was changeable, "would do things today he would cry about tomorrow if you said anything to him about it. He would sell you something today and tomorrow he would come back and almost double what you gave for it to get it back," and he referred to the fact that his brother had sold his farm and afterwards bought it back, paying more for it than he had received when he sold it. He also testified that his grandfather "lost his mind before he died," and that in 1920 his brother Charles' mind became so much affected that he had to be taken to the hospital, where he afterwards died. He referred to the fact that his brother, when a young man, had been engaged to be married, but had broken off the marriage, and when asked why he didn't go through with it, replied, he would have done so, "if it had not been for a certain party," and further elaborated that commonplace explanation by saying that a certain party told him he had better

not marry the girl. On cross-examination, the witness said that his brother completed his apprenticeship and worked at Port Norfolk, Virginia, for sixteen or seventeen years and accumulated some money there. That during those years he saw little of him and that when Charles left Port Norfolk he returned to Dorchester County, where he owned a farm, which he had bought from his brother, John. That he earned the money with which to buy the farm and later in his life he put his mother and father on it and they lived on it for some twenty years. That his father was eighty-four when he died and his mother seventy-six. That he was industrious, well liked in the community in which he lived and that everybody was his friend. That he was a source of help to the local church, and, in referring to the sale of the farm witness admitted that it might have been bought back because the testator's father objected to leaving the place on which he he had lived so long. The witness admitted that, when he left in 1915, he and his brother had gotten into a dispute. That they "fussed." At the conclusion of this witness' testimony, he was asked whether at the time of the execution of the alleged will Charles V. Stanton was capable of executing a valid deed or contract and to that question, over objection, he replied that he did not think he was.

We have quoted rather fully from the testimony of this witness, because his testimony comprises substantially all the material testimony adduced by the caveators to prove that their brother, Charles V. Stanton, was mentally incompetent to make the will. There were other witnesses but their testimony on this point is so meager and unconclusive, and so meaningless when considered in connection with the question with which we are dealing, that it would serve no useful purpose to refer to or analyze it in detail. No witness, other than the witness to whose testimony we have referred, expressed or was even asked to give an opinion in regard to the testator's mental condition, nor is there any testimony except that to which we have referred, which has any relation to or

bearing upon the issue of undue influence, except the testimony of Mrs. V. S. Walston, who had heard the testator say that he was going to leave his property to Bertha Stanton, but she also said that he told her he had made a will and that he had asked Lee Kelley to have the will written for him.

On behalf of the caveatees a number of witnesses, twelve or thirteen in number, most of whom had known the testator for many years, and including his family physician, who was also his intimate friend and who had testified before the jury which returned the inquisition finding him of unsound mind, were all of the opinion that he was capable of executing a valid deed or contract when he executed the will in question.

Coming now to the court's rulings on the two prayers to. which we have referred, in our opinion, there was no evidence in the case legally sufficient to warrant the court in submitting the third issue, which presented the question as to whether the will had been procured by undue influence, to a jury, and the caveatees' third prayer should have been granted.

In *Kennedy* v. *Dickey,* 100 Md. 164, in dealing with the legal sufficiency of the evidence in that case to show undue influence, this Court quoted and adopted the following language of the Supreme Court of the United States in *Beyer* v. *LeFevre,* 186 U. S. 125: " 'In such actions' as this, say the Court, 'the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reasons.' " And in *Schwanteck* v. *Berner,* 96

Md. 143, in passing upon a similiar question, we said: "The testimony in the record when taken all together does not in our judgment furnish any evidence tending to prove that the testator did not make the will which he intended to make or that the caveatee, who is not shown to have had any connection with the making of the will, procured its execution by the exercise of such undue influence upon the testator as to deprive him of his free agency and subordinate his will to her own, which is the degree of influence that the law regards as undue and sufficient to avoid a will procured by its exercise." And in *Hiss* v. *Weik,* 78 Md. 446, it was said: "Undue influence is that degree of importunity which deprives a testator of his free agency, which is such as he is too weak or too feeble to resist, and will render the instrument executed under its influence not his free and unconstrained act. *Davis* v. *Calvert,* 5 G. & J. 269. It is closely allied to, and in many of its aspects strongly resembles, actual fraud, and like the latter, when most cunningly executed, is exceedingly difficult to unmask. The results accomplished in a given case, the divergence of those results from the course which would ordinarily and naturally be looked for, the situation of the party taking benefits under a will towards the person who has executed it, and their antecedent relations to and dealings with each other, the legitimate, but unrecognized claims of others upon the bounty of the testator and their dependence upon him, the instincts of justice of which every unbiased mind is sensible, the natural ties of parental affection, together with the circumstances surrounding the transaction under investigation, and the inferences legitimately deducible from them, often furnish, in the absence of direct evidence (which from the very nature and secrecy of the wrong itself, is rarely obtainable) ample ground for the conclusion that undue influence has been used to accomplish an end which may be gross in its injustice, and whose very existence cannot be satisfactorily accounted for, except upon the hypothesis that undue influence has produced it."

A careful examination of the record in this case reveals no evidence which could possibly be regarded as legally sufficient to warrant the inference that the will involved in this case was procured by undue influence, as that term is defined in the cases to which we have referred. It is not suggested that the testator ever intended to divide his property equally among his next of kin; it does not appear that he ever intended to make any different disposition of it than that actually made in the will, except his offer to "will it" to his brother, Grant, which the latter refused, and the offer to will it to Grant's daughter, Bertha, which suggestion Grant also discouraged, and to a sister-in-law. Nor is it shown that Lee Kelley possessed any unusual influence over him or that he suggested the terms of the will. It is true that Lee Kelley instructed the draftsman of the will as to its contents, out of the presence of the testator, but that fact loses any significance it may have had when it is considered that McAllister, who drew the will, lived at Vienna, ten or twelve miles from Galestown, and that as Kelley lived at Vienna and frequently visited Charles V. Stanton, it was more convenient for the latter to have Kelley have the will drawn and bring it to him on one of his visits than it would be for the decedent to go to Vienna; and that after it was drawn Stanton had it in his possession for some time before it was executed, and that when he wanted to execute it, it was he who sent for Lee Kelley and drove with him to Harper's, where he executed it, and that he himself informed Mrs. Walston that he had told Kelley to have the will written. Nor is there anything in the will itself so unnatural or unusual as to excite suspicion. His brothers were all married with homes of their own. Two of them lived in different states, and, with the exception of John, he saw them infrequently, perhaps several times a year. Charles Lee Kelley, the devisee, was the only child of a deceased sister, and he appears to have been on the friendliest terms with Lee Kelley, his brother-in-law, and the father of the devisee. Under such circumstances no inference

of undue influence can be drawn from the fact that he devised all his property to his nephew, especially if the testimony of the caveators that he voluntarily offered to make the same disposition of it in favor of his niece, Bertha, his sister-in-law, the wife of Vernon Stanton, and his brother Grant, is considered.

This brings us to the court's action in refusing the caveatees' second prayer, which instructed the jury that there was no evidence legally sufficient to show that the decedent was not of sound and disposing mind and capable of executing a valid deed or contract when he executed the will in question.

The correctness of that ruling depends upon the weight to be given the testimony of Grant Stanton, and in connection with it we will consider more fully the ruling which permitted this witness to express his opinion as to the testamentary capacity of the testator.

The general rule controlling the admission of testimony of this character is stated in *Townshend* v. *Townshend*, 7 Gill, 28, in which it is said: "The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance, and acts of the testator in various business transactions, for a long series of years, is not mere opinion, it is knowledge, and strictly analogous to the cases of personal identity, and hand-writing, which are constantly established in the law courts, by the opinion and judgment of persons who have enjoyed the opportunity of observing the person, or hand-writing sought to identified, or proved." The appellees' contention appears to be that the rule as thus stated permits a non-expert witness, who has had a sufficient opportunity of observing the conduct and appearance of the testator, to arbitrarily express an opinion as to his testamentary capacity without the disclosure of any facts or reasons for the opinions which he may have learned from such observation. That is not, however, our understanding of the rule, and in our opinion such a construction would be fraught with the utmost danger to the security of estates, since it would

expose the will of every testator to the attack of any disappointed relative having the requisite opportunities of observation, whose scruples were not sufficient to prevent his abuse of the extraordinary and dangerous power thus given him.   And the court, in the case to which we have just referred, was careful to guard against any such misinterpretation of its language, for after stating the rule it added: "In the case of *Grant* v. *Thompson,* 4 Conn. Rep. 203, the Supreme Court of Connecticut held, that though the mere opinions of witnesses relative to the sanity of a party, are not admissible, yet their opinions, in connection with the facts on which they are founded are admissible.   The Court said: * * * 'The county court rejected the mere opinions of witnesses, relative to the defendant's insanity, but admitted them in connection with the facts on which they were founded; and in doing this, they discriminated soundly and legally. This is not a novelty, but sanctioned by the usual practice of courts, in such cases.'   They say: 'Although it would be dangerous in its tendency to admit the uncorroborated opinion of a witness, relative to the operations of another's mind, yet, when it is found to be presumptively supported by facts, it carries with it a convincing weight.   The best testimony the nature of the case admits of, ought to be adduced; and on the subject of insanity, it consists in the representation of facts, and of the impressions which they made.'"   And the same principle is expressed by CHIEF JUDGE BOYD, speaking for the Court, in *Crockett* v. *Davis,* 81 Md. 150, when, in speaking of the admissibility of the opinion of a medical expert, he said:   "If, for example, a physician were to testify that in his opinion a testator was not of sound and disposing mind, capable of executing a valid deed or contract, and would in his further examination say, that the only reason he had for such opinion was that the testator used patent medicines, or was a member of some religious or political faith other than his own, such opinion would be based on a foundation so clearly repugnant to right reason that a court would

not hesitate to instruct the jury it was not sufficient to support a verdict." And in *Whisner* v. *Whisner,* 122 Md. 204, the Court, through Judge Briscoe, said, in discussing the refusal of the court in that case to allow Allen H. Whisner, a brother of the testator, to express an opinion as to his testamentary capacity:

"While it is true this question was propounded to the witness at various stages of his examination, both in chief and on re-direct, after cross-examination on the part of the defendants, yet we are unable to find that the witness had disclosed in his entire testimony such facts, and such adequate means of knowledge as qualified him, as a non-expert witness, to express an opinion as to the mental condition of the testator at the time of the execution of the will.

"He was not an expert nor an attesting witness to the will and he did not fall within the rule which allows this class of witness to testify as to the mental capacity of a testator, without first stating the facts and circumstances on which the opinions were formed."

And to the same effect are the cases of *Waters* v. *Waters,* 35 Md. 531, and the *Berry Will Case,* 93 Md. 580, in which it was said: "There must be a basis shown for the formation of a rational conclusion which is not a mere conjecture, but is knowledge. Hence, if that basis is trivial or insufficient, or does not furnish in the judgment of the Court, an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted to express any conclusion at all. Facts must be stated so that it may be seen whether the conclusion deduced from them by the witness has any relation to, or can be fairly said to be dependent on them." *Grill* v. *O'Dell,* 113 Md. 633. Nor is there anything in these cases inconsistent with the ruling in *Weems* v. *Weems,* 19 Md. 345, since the language employed in that case must be construed and interpreted in connection with the facts involved in the question with which the Court was dealing and the Court there, after referring to the relations between

the testator and the witness, found that "it is not necessary, however, to rely on these considerations alone, as the witness has stated in his testimony facts and circumstances sufficiently fortifying his opinion to render it competent evidence."

Coming now to the facts, it cannot be said that the evidence in this case was legally sufficient to justify the action of the trial court in allowing the witness, Grant Stanton, to express an opinion of the testamentary capacity of the testator at the time of the execution of the will, since in our opinion he had not the opportunity necessary to form a rational opinion on that subject, nor were the facts upon which it was based sufficient to support it. He only saw his brother at infrequent intervals, he had never had any business relations with him except on the occasion when he occupied his farm nearly three years before the execution of the will, and the evidence disclosed nothing in the history of that transaction which can be said to reflect upon the mental capacity of the testator. The facts upon which he relied were vague, trivial and utterly insufficient to support the opinion which the witness gave. The testimony of the other witnesses for the caveators was even less conclusive than that to which we have referred. Vernon Stanton, another caveator, testified that his brother, when a boy, was "peculiar," different from other boys, and that on one occasion in later life when he visited him, "Charlie" objected to his feeding the witness' horse with his "Charlie's" corn, saying that he had to buy the corn. Mrs. Walston, who at times acted as his amanuensis, found him "peculiar" and "changeable." V. T. Gravenor, who employed him in 1920, said he "seemingly slighted his work," John Lankford said that, in 1915, Mr. Stanton struck him as being peculiar in some way; he could not "tell you how." John Stanton, the executor, refused to say that he was incapable of executing a valid deed or contract on May 3, 1918. Luke Hackett's comment on the testator's "peculiarities" was that, at the open forum con-

ducted at the village store, "he would generally be inclined to take the opposite side in questions or anything like that; very peculiar in that manner."

This, with the exception of the return of the inquisition, fairly represents the testimony relating to the testator's mental capacity and, without discussing it further, it is sufficient to say that it was patently insufficient to show any want of testamentary capacity in the testator at the date of the execution of the will. The inquisition is also without sufficient probative force to show testamentary incapacity at the time the will was made, in the absence of any evidence tending to show that the mental condition of the testator existing at the date of its return extended back to the date of the execution of the will, especially in view of the fact that the inquisition itself stated that such condition had only existed for a few weeks.

For the reasons stated, the second and third prayers of the caveatees should have been granted, and it will therefore be necessary to reverse the rulings appealed from which are embraced in the second and third exceptions.

*Rulings embraced in second and third exceptions reversed.*