BELOTE ET AL. *v.* BROWN ET UX.

[No. 146, October Term, 1948.]

*Decided April 29, 1949.*

The cause was argued before MARBURY, C. J., and DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Ralph W. Powers* and *Jerrold V. Powers*, with whom was *Ralph G. Shure* on the brief, for appellants.

*Carey E. Quinn*, for appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by plaintiffs, in a suit to set aside a deed, from a decree dismissing the bill except for an accounting for rentals collected. All the questions presented depend upon questions of fact. Seventeen witnesses testified, one by deposition in Florida, the other sixteen in open court. Much of the testimony is conflicting; most of the witnesses were interested or, as the lower court found, showed definite bias. Judge Charles C. Marbury, who heard the case, filed a careful and thorough opinion, in which he discussed the questions of law and fact and the weight and reliability of the testimony. He stated the case thus: "The bill of complaint in this case seeks to set aside a certain deed from Leona H. White to the defendants, dated November 29, 1944, and an undated agreement between the same parties, shown by the evidence to have been executed contemporaneously with the deed, for an accounting of rentals derived from the apartment premises conveyed in the deed, and for further relief. The original plaintiff, Sally Oliver, has died during the pendency of the case and upon the suggestion of her death other parties [possible successors in interest] have been substituted as plaintiffs."

"Mrs. Leona H. White, daughter of the original plaintiff, died on September 13, 1946, at the age of approxi-

mately seventy-two years. From 1924, at first as tenant by the entirety with her late husband, and thereafter as his survivor, until the date of this deed, she was seized and possessed of Lot 15, Block 46, of the subdivision known as Fletcher's Addition to Takoma Park. This lot was improved by premises No. 7213 Flower Avenue, built in 1924, having an English basement and two stories above, which was divided so as to comprise six apartments, at a gross rental of $190.00 monthly. After the death of Mrs. White's husband she continued to occupy one of the apartments, containing six rooms, in the building and seems to have been successful in renting the others.

"In February, 1942, Mr. and Mrs. Brown, the defendants, and their two children, rented a portion of the basement apartment occupied by Mrs. White, at first at a monthly rental of $20.00, which was reduced to $15.00 in consideration of certain services performed by Mr. Brown by way of tending the furnace and working in the surrounding yard, including taking care of Mrs. White's flowers. The Browns had a kitchen and dining room, as well as sleeping quarters, but shared a living room with Mrs. White. It appears from the testimony that up until November 1944, when the deed in question was executed, Mr. Brown frequently assisted Mrs. White in repairing the plumbing and refrigeration in the building at some saving of expense to her.

"Mrs. White's closest relatives were her aged mother, Sally Oliver, now deceased, and a number of nieces, and great nieces, as well as a stepson, who testified in the case. It was variously testified that during the latter part of October or early November 1944 Mrs. White suffered a slight 'stroke' or 'spell' due to a chronic condition of arterio sclerosis, from which she had been suffering for a number of years. It appears that Mrs. White, because of this change in her physical condition, decided that she needed the assistance of someone to carry on her business, involving the rental of the apartments under the war-time conditions, as well as her household

work in maintaining the portion of the apartment occupied by her as her separate home. She first proposed to her niece, Mrs. Sadie L. Ward, who was a graduate nurse, and who lived a short distance from her in Takoma Park, that she would turn over the property to her if Mrs. Ward would come and take care of her. The latter replied that she would have to think it over, and Mrs. White informed her that she would give her a few days because the Browns were going to move at the end of the month. Mrs. Ward testified that she did not accept the proposition because she had two children to support and could not earn sufficient to enable her to accept. Mrs. Brown testified that she said to Mrs. Ward if she would come in and take care of Mrs. White the Browns would move out right away. From the testimony it appears that no other member of her family was in a position to accept a similar proposition and take over the premises and care for Mrs. White. [Plaintiffs contend that another niece, Mrs. Hamilton, was in a position to do so, but her testimony does not support this contention and, we think, indicates the contrary.]

"At about the same time the Browns indicated that they would like to vacate the apartment and move elsewhere. [Plaintiffs contend that there is no evidence that the Browns had found a house and intended to move; this contention, we think, is immaterial.] Mrs. White, who had been on friendly terms with the Browns, then proposed that she deed the apartment house to them, reserving a life estate together with the right of occupancy and the rents, issues, and profits therefrom, and enter into an agreement with the Browns whereby they should furnish board and meals to Mrs. White for a consideration of $40.00 per month and the Browns pay her rent for the basement apartment at the rate of $15.00 per month. In addition the Browns were to agree [in consideration of the deed] to furnish Mrs. White such care, * * * nursing, [general attention] and personal assistance as her condition and extremities might require so long as she might live.

"The evidence shows that Mrs. White, during the month of October, 1944, sought the independent advice and counsel of Mr. Carey E. Quinn, a member of the Bar. She was taken to Mr. Quinn's house on one occasion, as well as to his office, by Mr. and Mrs. Brown. These conferences resulted in the preparation of the deed and agreement in question by Mr. Quinn, and the execution of these instruments at Mrs. White's apartment on November 29, 1944, when there were present, in addition to the parties, Mr. Quinn and a notary public, Ruth B. Drake, who subsequently married, and testified as Ruth Drake Stauffer.

"At the request of members of Mrs. White's family, on July 14, 1946, she was examined as to her mental competency by Drs. J. Marion Bankhead and G. Burton Queen, who certified that she was incompetent, unable to handle her own affairs, that the cause of such incompetency was cardio renal disease, and that such incompetency was permanent and would likely last until death. These certificates were attached to a petition filed in this Court on July 23, 1946, by Sadie L. * * * [Ward (?)] and Fred A. White, stepson of Mrs. Leona H. White, which resuted in the degree of August 20, 1946, adjudging her incompetent by reason of mental disability and appointing Ralph G. Shure and Leona L. Hamilton, Committee of her estate. As above stated, Mrs. White died less than a month later, on September 13, 1946, and the bill in this case was filed November 2 of the same year.

"The plaintiffs contend that the deed and agreement as to care should be set aside for the following reasons:

1. Failure of consideration.

2. Lack of mental capacity on the part of Mrs. White to execute a valid deed or contract on November 29, 1944.

3. Undue influence resulting in the execution of those instruments in favor of Mr. and Mrs. Brown.

4. The existence of a confidential relationship as between Mrs. White and the Browns, giving rise to constructive fraud on their part so as to vitiate those in-

struments and make it inequitable that the Browns retain the property conveyed by the deed, or the rents and profits therefrom.

After careful observation of the witnesses who testified in open Court, as well as after reading the transcript of testimony, the Court has reached the conclusion that the plaintiffs have not presented a case which would justify the Court in striking down the deed and the agreement in this case. Of the thirteen witnesses who testified for the plaintiffs, with the exception of Dr. Queen, Mrs. Stauffer, the notary public, and Mr. Howard, the banker, the witnesses consisted of three nieces, two great nieces, the stepson of Mrs. White, and four tenants. Such information as the members of the family were able to give with reference to the period when the Browns occupied the apartment during Mrs. White's lifetime was derived from infrequent visits, and was found to have little probative value. These witnesses were certainly not disinterested parties and many of them, as well as the four tenants who testified, showed definite bias."

On the question of mental capacity plaintiffs rely chiefly upon the adjudication of incompetency on August 20, 1946 and the testimony of Dr. Queen, one of the physicians who examined Mrs. White in preparation for the institution of that proceeding. In *Kelly v. Stanton*, 141 Md. 380, 381, 118 A. 863, it was held that an adjudication of mental unsoundness in 1920 was admissible in evidence on a question of mental incapacity in 1918, but was not legally sufficient to take that question to the jury. In the instant case, as Judge Marbury says, it is evident from the testimony that Mrs. White's condition, both physical and mental, deteriorated rapidly during the spring and summer of 1946. Dr. Queen, who saw her only once, for about three-quarters of an hour on July 14, 1946, says, on the basis of a coroner's [autopsy (?)] report dated September 13, 1946 "upon examination of her brain," and of his own examination of her in July, that "to have as advanced a case of arterio-sclerosis as this lady had in September 1946, nineteen [*sic*] months

previous the condition, of necessity, due to the slowness of developing would have definitely impaired her mental capacity and ability to think clearly and to weigh properly anything that she might do." He invites the court "to deduce" from his testimony that in 1944 she "was incapable of knowing what she was doing in the signing of a deed." The "coroner's report is not in evidence; it is not shown to have contained more than the statement of "cause of death" in the death certificate, *viz.*, "Cardiovascular renal disease." However, on cross-examination Dr. Queen admitted that it is possible that Mrs. White "could have been able to know what she was doing about signing this deed in November, 1944. The testimony of the lawyer and the notary who saw her sign shows that she did know what she was doing. Dr. Shannon, who was her own physician, from January 5, 1942, to September 8, 1946, paid her thirty-five visits from the year 1943 till her death, and signed her death certificate, says in his deposition, that she was "mentally capable of making a serious contract or deed on November 29, 1944."

Plaintiffs contend that "the record is replete with observations of witnesses that Mrs. White was not mentally alert after her stroke; that her conversation was irrational and unconnected; that she was not her normal self in many ways." Mrs. Hamilton, the niece, who considered herself "closest to Mrs. White in affection" after Mr. White's death, except Mrs. White's mother, made one of these "observations": "She just was not mentally alert after the stroke. She was afraid to make decisions." Asked to explain what she meant or why she arrived at the conclusion that Mrs. White was mentally not alert, she said, "Well, on one occasion when myself and my family were there she decided that she would pick out a coffin and purchase it. So we called Mr. Walters, and she selected the one that she liked. We all told her that it was nice, but she would not decide on it until she called Mr. Brown in and he o.k.'d it. She merely said that she would take that one after he had o.k.'d it." Such trivialities, not even said to have occurred before

or near the date of the deed, are relied on as evidence of both mental incapacity and "domination by the Browns." Mrs. Smith, a grand-niece, when she was first married, lived with her husband at Mrs. White's apartment house [or apartment (?)] from 1937 to 1941, and their son was born there. Asked whether there came a time when she noticed any change in Mrs. White's physical condition, she said, "Well, after she had the stroke I noticed—of course, it did not seem the same. * * * she * * * did not seem crazy or anything like that, but she did change a lot in her ideas." Asked how she changed, she said that when she and her family lived there Mrs. White [who was then caring for herself and her apartment and managing the apartment house] would not allow them to have a dog in the house (but permitted them to keep one in the woods back of the house) because she never allowed any of her tenants to have dogs and could not make an exception for her niece, but Mr. and Mrs. Brown [who in August, 1945, practically took over the management of the apartment house] have had a dog, which got on Mrs. White's couch and furniture, "and she never liked dogs, but she let them, and I just knew that that was not like her. I did not know why she did it." Plaintiffs contend that one of the "indications of the domination of Mrs. White by the Browns * * * to be found in the record" is that "the old lady unprotestingly permitted the Browns to have a dog in the apartment and on the furniture, when she had previously refused to permit her own [great]-grand-nephew to have a dog in the house." As Judge Marbury says, plaintiffs' evidence on mental capacity is "fragmentary, inconclusive and remote as of the time of the execution of the deed." We agree with his conclusion that "on the question of mental capacity the plaintiffs have not met the burden of proof." We need not decide whether there is any legally sufficient evidence of mental incapacity. We do not suggest that there is. We find no evidence of undue influence, as distinguished from breach of duty in a confidential relation.

The testimony on the questions of mental capacity and undue influence illustrates the bias of members of Mrs. White's family and former tenants on all questions.

What plaintiffs call failure of consideration is really an alleged breach of contract. There is no evidence of any such failure to furnish care, nursing and other attention as would show an original intention not to perform the agreement and would constitute fraud in the inception of the contract and a ground for setting aside the agreement and the deed. *Flanagan v. Flanagan*, 133 Md. 332, 105 A. 299. Contracts for personal service or to live together will not be specifically enforced. *Fitzpatrick v. Michael*, 177 Md. 248, 9 A. 2d 639. Nevertheless, pecuniary relief may be given for breach of such contracts. *Long v. Huseman*, 186 Md. 495, 47 A. 2d 75; *Hoffman v. Rickell*, 191 Md. 591, 600, 62 A. 2d 597, 600; *Brandenburg v. Harshman*, 193 Md. 104, 65 A. 2d 906.

For several months before Mrs. White's death her kidney trouble had so far progressed that she had lost control of her bladder and bowels. Judge Marbury refers to an "unpleasant occurrence of July 4, 1946, when several members of Mrs. White's family visited her and found her, at the time, unattended by any of the Browns, while the latter had gone to a Fourth of July celebration." Mrs. Hicks, a former tenant of the adjoining apartment, testifies that on the evening in question and on other occasions if the Browns "went out for the afternoon or evening, or to the store or some such thing," they would ask her to "look out for" Mrs. White. She says, "When they asked me to do that I stayed in my own apartment and was supposed to listen if I heard her and if she called me I would go to her." On the 4th of July Mrs. Hamilton, the favorite niece from Newport News, her brother, Mrs. Ward, the niece who was a trained nurse and had declined to undertake the care of Mrs. White on the terms afterwards accepted by the Browns, and her sister Mrs. Jenkins got the keys to Mrs. White's apartment from Mrs. Hicks. When they went in, Mrs. Hamilton says, Mrs. White "was soaking wet.

She said she had been there all evening by herself."
Mrs. Ward says, "She was wet from her neck down to
her feet. She said that the Browns had gone to fireworks
and had been gone about fifteen or twenty minutes, so it
must have been that way before they left." Mrs. Ward
"changed" her and her bed and rinsed out her night-
gown and hung it on the line. The next day, they say,
Mrs. Brown was indignant because they had gone in and
"upset" Mrs. White. Mrs. Brown says Mrs. White knew
they were going to the fireworks and wanted them to go.
Mrs. Hamilton's version and Mrs. Ward's cannot both
be true, but both show the same bias against the Browns.
Mrs. Hamilton indicates that they had left Mrs. White
all evening; Mrs. Ward that they had been gone only
fifteen or twenty minutes, from which she draws the
gratuitous conclusion that they had neglected necessary
attention before they left.

Mrs. White's physical state during the last few months
of her life would necessarily make conditions very un-
pleasant unless she promptly received attention when-
ever necessary, but would also make it practically impos-
sible to insure immediate attention at all times unless
from special nurses. The Browns have not asked a nar-
row construction of their obligation "to furnish such
* * * nursing * * * and personal assistance as her condi-
tion and extremities may require as long as she may live."
But Mrs. White's apartment was not a hospital, and the
Browns were not trained nurses. Their contract did
not obligate them to conduct a hospital or to do the work
of three special nurses. Some of the reasons for shortage
of nurses in hospitals and homes for the aged during and
since the War are illustrated in Mrs. Ward's testimony:
"I am a Clerk in the government. Prior to that I was
a graduate nurse; special duty nursing. * * * When I
was nursing the compensation was $6.00 per day. I
haven't nursed since 1942. They make $10.00 a day now
and I make more than that where I am. I do not know
what practical nurses get. * * * I have often taken
care of persons who did not have control of their bowels

and kidneys but I never did twenty-four hour duty. The longest I did was twelve hours." The compensation of nurses was not enough to attract and hold enough nurses, but was more than Mrs. White would have been able to pay. Mrs. Brown says the Browns "looked after" Mrs. White during the day hours and the night hours, and changed the bed clothes, up to the date of her death. "Sometimes we spent all hours of the night when we were not even called. We changed the bed clothes at night, and that was required often." She says that, in addition to the nursing service rendered by her, Mrs. White had insurance under which she received from the Metropolitan Insurance Company nursing service for, she thinks, three 14-day periods in 1946. Dr. Shannon's testimony is that the Browns' services consisted of "medications administered, proper diets furnished, bathing and general nursing care"; their care and services complied with his instructions; and the services were, in his opinion, conscientious and consistent and, all the facts in his knowledge considered, were satisfactory.

There is no evidence that Mrs. White was not satisfied with the Browns' services, except testimony of members of her family, some of whom, after the court had ruled (without objection) that statements by Mrs. White out of hearing of the Browns were not admissible, repeatedly mentioned or insinuated expressions of dissatisfaction by Mrs. White. In an unmailed letter, dated December 26, 1944, written and signed by Mrs. White and found in her apartment after her death, she said, "the woman who lets my apartment takes care of me. I am well taken care of." Regarding this letter Judge Marbury says, "It was written slightly less than a month after the date of the deed, indicates that it was written by a person of ordinary intelligence and clearly shows that Mrs. White felt satisfied with the care she was then receiving from the Browns." "Such information as the members of the family were able to give * * * was derived from infrequent visits, and was found to have little probative value." *Supra.* These infrequent visits were most

frequent during the last few months of Mrs. White's life. Mrs. Hamilton says she "was here six times from May until September," 1946. She can recall definitely only one previous visit (in "January or February," 1945) since November, 1944. On the 1945 visit, she says, "The Browns were very uncordial to us," but she recalls no lack of care of Mrs. White. She is emphatic about the lack of care and attention she saw in 1946, though wholly indefinite as to dates and number of particular occurrences. This is characteristic of plaintiffs' witnesses. They testify to facts which (so far as they are facts) apparently occurred only during the last months of Mrs. White's illness and seldom then. As Judge Marbury says, "It is apparent that * * * [on July 4, 1946] Mrs. White's family had determined to take the necessary steps to upset the transaction between Mrs. White and the Browns, which occurred more than eighteen months previously." From July 4th to the adjudication on August 20th and the institution of this suit on November 2nd, the family moved expeditiously, but there is no evidence that they made any effort to obtain for Mrs. White any care and attention better than that which they say was so inadequate. Judge Marbury says, "On the matter of the services rendered by the Browns the only witnesses who testified for the plaintiffs upon that subject were the interested members of the family and four former tenants, all of whom appear to have had some difficulties with their landlords, the Browns, and displayed bias in their testimony." He also says, "Considering the testimony as a whole the Court has reached the conclusion that both before and after the date of the execution of the deed and until Mrs. White's death she was cared for by Mr. and Mrs. Brown in a reasonably satisfactory manner commensurate with her deteriorating physical condition." If in reaching this conclusion Judge Marbury took the testimony of witnesses for plaintiffs at less than face value, we cannot say (after carefully reading all the evidence) that he was wrong.

On the question of confidential relationship Judge Marbury says: "It is claimed by the plaintiffs that a confidential relationship existed between Mrs. White and the Browns. The Court is asked to reach this conclusion upon the showing that Mrs. White rented a portion of the apartment to the Browns in February, 1942, and that they lived there from that time until her death, that the Browns and Mrs. White became friendly so that Mrs. White had them perform certain services for her. Soon after the Browns' tenancy began their rent was reduced from $20.00 to $15.00 a month in consideration for Mr. Brown's help in taking care of the mechanical appliances and tending the yard and flowers. Moreover the Browns were asked to and did attend to various items of business for Mrs. White. There is, however, no evidence in the case showing over weening on the part of the Browns or the creation by them of a situation where Mrs. White reposed confidence in them which was abused. Until approximately a month before the date of the deed the Browns were in no better position than Mrs. Ward so far as being offered the transfer of the property. Mrs. Ward, for reasons of her own, was unwilling to accept the offer made by Mrs. White, which relegated the latter, after the advice of her counsel, to make the offer to Mr. and Mrs. Brown, which they accepted. The circumstances of this case are not such that the Court can say that the deed in question was procured by the defendants under the situation of confidential relationship existing between them. While it is true that once a confidential relationship is established by clear and convincing proof the burden shifts upon the grantees to demonstrate that the transaction was *bona fide* and carried out without violation of the trust reposed in them, the burden of proof in the first instance to establish the confidential relationship rests upon those asserting it. This burden of proof the plaintiffs have failed to meet in this case."

We are inclined to agree that the neighborly friendship and small business transactions between Mrs. White and the Browns do not evidence any pre-existing confi-

dential relation before November, 1944,—even if we overlook the fact that she then took advice of counsel about business transactions. We may, however, assume (without deciding) that this contract and deed created a lifetime relation so inherently confidential that the very negotiation of such a transaction, without independent advice, might constitute a confidential relation. On this assumption, we think the fairness of the whole transaction is affirmatively shown both by the terms of the contract and the deed and by the fact that Mrs. White had adequate independent advice. Plaintiffs contend that she had no "independent advice"; that her lawyer in drafting the contract and the deed acted merely as a scrivener. Quite the contrary. Mrs. White could not have suggested, or understood without legal advice, the significance of reservation of a life estate and execution of a written contract for services for life *in consideration of the deed*. In a case just decided, there was no such reservation or written contract and the grantor would have been left penniless in her old age, if such a contract had not been shown by inference from circumstances over a number of years. *Brandenburg v. Harshman*, 193 Md. 104, 65 A. 2d 906. The contract and the deed are shown, on their face and from the other evidence, to have been carefully planned, as well as drafted, by Mrs. White's counsel for her protection.

The property is valued at $20,000. Of the gross income of $2280 per year less than half was net, without allowance for cost of management. The rentals were limited by law; repairs and other expenses were not. Net income was insufficient to pay expenses at a hospital or a home for the aged. Plaintiffs say she should have gone to such a home. There is no evidence that she could have obtained admission to any such home; applicants usually far exceed vacancies. If she could have obtained admission, she could have provided for expenses (her income being insufficient) only by turning over her property to the home, *i. e.*, by practically the same arrangement she offered to make with Mrs. Ward and did make with the

Browns, except that she might not have been able to reserve a life estate.

Plaintiffs, like many expectant heirs, overlook the fact that Mrs. White's property was her own, not theirs. Neither she nor the Browns were fiduciaries for her family or owed them any duty. Lump sum contracts for service for life involve risks on both sides and trust on the part of the employer. With a person situated as Mrs. White was, some such contract was a virtual necessity. She alone could and must decide whether she could and would trust a relative, a home or stranger. There is no evidence that any of her family could or would have made the arrangement the Browns made or could or would have given her better care than she got from the Browns. Hindsight may compute a profit for the Browns, not without irksome labor on their part. When the contract was made, nobody knew whether Mrs. White would die within two years, or, like her mother, would reach 90.

On the subject of accounting Judge Marbury says:

"While the Court, as above indicated, will not set aside the deed nor agreement, there is another phase of the case which appears to justify certain relief as against the defendants. The bill prays for an accounting of the rentals from the property of Mrs. White collected by the defendants. In response to a demand for an accounting the Browns rendered an account which was attached to the bill as Exhibit 'D.' The defendants have relied upon the agreement contemporaneous with the deed under which the Browns were to receive $40.00 per month board and were to pay $15.00 to Mrs. White per month rental for the basement apartment, and the Browns further agreed to furnish her such care, nursing, general attention, and personal assistance as her condition and extremities might require so long as she might live. This latter feature of the agreement was in consideration of the deeding of premises 7213 Flower Avenue, Takoma Park, by Mrs. White to the Browns, subject to the reservation to Mrs. White of a life estate. The accounting shows receipt of $2446.67 [from August 1, 1945] and

lists numerous charges against that total. The last item in the account shows a charge for painting, cleaning, repairing, janitor service, and full management of $100.00 per month, totaling $1,300.00. This is contrary to the terms of the agreement and there is no valid evidence of any change in the contractual relationship existing between Mrs. White and the defendants from the time of the execution of the agreement until her death. Without an accounting there would seem to be no justification for the charge of $100.00 per month made by the Browns. For this reason, while the deed and the agreement of November 29, 1944 contemporaneous therewith will be allowed to stand, the Court will retain jurisdiction of the case for the purpose of requiring a full accounting by the Browns of the monies which they received as rental from the date of the deed until the death of Mrs. White. The Court will therefore sign a decree denying the other relief prayed for by the plaintiffs, but requiring an accounting by the Browns to the personal representative of Mrs. White's estate."

As there is no cross-appeal we cannot consider whether the decree is unjust to the Browns. It is more than fair to plaintiffs. Plaintiffs themselves have shown that from August 1, 1945, or thereabout some additional arrangement was made (not covered by the 1944 contract) by which the Browns practically took over the management of the apartment house. As Judge Marbury says, "there is no valid evidence" of the terms of the new oral arrangement, nor is there evidence that $100 a month would be a *quantum meruit* for the additional services. Under the decree Mrs. White got the benefit of valuable services and the Browns got nothing at all for them.

*Decree affirmed, with costs.*