RIGGLE ET UX *v.* McCANN ET UX.

[No. 96, October Term, 1950.]

*Decided March 14, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Malcolm J. Coan*, with whom was *Howard Calvert Bregel* on the brief, for the appellants.

*William S. Wilson, Jr.*, with whom was *Edwin J. Murphy* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree declaring a deed, dated January 7, 1947, from plaintiff (husband and wife) to defendants (husband and wife) to be null and void and the property No. 2413 Maryland Avenue to be the sole and absolute property of plaintiffs. The testimony was taken in open court. We have not the benefit of an opinion of the lower court, but it is evident that on the material questions of fact, where the testimony is conflicting, the judge in general, but not in all respects, accepted plaintiffs' version and rejected defendants'. We shall not review the testimony in detail but shall state as facts some, at least, of our conclusions. The testimony of all the parties is to some extent exaggerated and self-contradictory, but after all discounts there is irreconcilable conflict.

Plaintiffs were married in 1898. They have no children. In January, 1947, he was about seventy-two, she about sixty-six. His education had not gone beyond the third grade. He could read and write, but owing to deafness could hear little. He had been a carpenter and cabinet-maker. In 1930, when the man he worked for died, he retired. Since then he has not worked, except on odd jobs at home or outside. She never went to school, could not read or write, but had acquired the dangerous faculty of signing her name, with difficulty, without being able to read what she signed. Since he retired she had supported them both, with the help of what he made, by renting rooms. In 1942 they

bought as tenants by the entireties, for $4,500, the Maryland Avenue house, where they live, in fee. She says he contributed $2,000 "that he had worked [for] up at the hardware store." She rented another house in the same block (No. 2435), and rented out rooms in both houses. She received from "roomers" about $27 a week from their own house, and $35 from the other one. They had $7,000 on deposit, in the names of both, with a savings bank and a building association. In December, 1946 she also kept at the house $2,000 in cash, which she had saved from rents. One of her roomers, who did not testify, helped her, gratuitously, with rent receipts, deposits and otherwise. She had had pneumonia some time before, and in 1946 was suffering from neuritis and arthritis, and acutely from glaucoma, and had in prospect an operation for removal of her left eye, which eventually was performed at the Wilmer Institute in the summer of 1947.

Mr. Riggle is a nephew of Mrs. McCann. He had been married about 1936. He had been overseas, in the service, and returned in January, 1946. While he was away his wife had worked for Bendix near plaintiffs' house. Since his return he has been working for General Electric, and is making $50 a week. With the aid of a G. I. loan defendants are buying a $19,000 house, into which they have put about $6,000 from the sale of another house. They also own a 1949 Nash, not yet fully paid for. Since his return they, and before his return his wife, had been more or less attentive (more, they say, less, plaintiffs say,) to Mrs. McCann in visiting her and doing things for her and for the house. Plaintiffs say they did little and usually were paid for jobs they did, e. g., painting; defendants say they did much without compensation. Mrs. Riggle details prolonged housework and irksome personal attention during illness of Mrs. McCann. Other witnesses say Mrs. McCann employed a colored woman to come in and do cleaning.

Mrs. Riggle, when asked when the first conversation about the Maryland Avenue house took place, said,

"That started way back almost from the beginning", *i. e.*, presumably, from Mr. Riggle's return in January, 1946. Mr. Riggle says, "my aunt was asking us for quite a while if we wanted the property, and it went on almost, well, I will say at least eight months to a year before we made up our mind, because we did not want to do anything we may be sorry for later, so she kept after us until finally she asked my wife * * * to get a lawyer, and my wife asked my aunt if she had one." Mrs. McCann mentioned a lawyer (not her present counsel), whom she had found unsatisfactory and did not want. Mrs. Riggle consulted her mother and at her suggestion telephoned Mr. Thomas E. Mason and asked him to come to Mrs. McCann's house. Mr. Riggle, when asked by the court whether his aunt or uncle told him there was any limitation on their ownership, or they were to hold it for any particular purpose, said, "The only reason my aunt said was to take care of my uncle after she passed away. We volunteered to that, and it still holds good as far as I am concerned."

On December 20, 1946, about two days after Mrs. Riggle had telephoned him, Mr. Mason went by appointment to Mrs. McCann's house and talked with Mrs. McCann and Mrs. Riggle. He stayed about half an hour. He had never met any of the parties. He understood he went there to represent Mrs. McCann. Mrs. McCann wanted to give this Maryland Avenue property to the Riggles. "She wanted to make a gift of it. I talked to her. Frankly, I tried to talk her out of it. She apparently was expecting to go to the hospital for this operation, and she wanted to get this thing settled before she went, and she wanted to turn this property over to these young folks. * * * the impression I received was she was thinking maybe she would not come back. * * * I told her it was not necessary for her to deed that property to those young people, that she could have the property—in other words, I told her about a life tenancy so she and her husband could have the property as long as they lived, and the young people have it—in

other words, a life tenancy and a remainder. She did not want that. I discussed with her—I told her about a deed with powers * * * in other words, she could deed the property to some third person and [it could] be deeded back to her with powers which, if she executed them, it would be all right, and if she did not, * * * after her death it would go to them. She did not want that. She wanted to give the property to them. She wanted to make an outright gift of it." When he was there he got the deed from Mrs. McCann, who had it in the house, so that he could go to his office and draw the new deed.

Mr. Mason drew the deed and on January 7, 1947 went with a notary, his stenographer, to the house to have it executed. When they arrived Mrs. McCann and Mr. and Mrs. Riggle were there. Mrs. Riggle went out to get Mr. McCann and came back with him. Mr. Mason told them he had brought the papers they had asked him to bring, and had brought a notary with him for the purpose of executing them. Then he took the deed and "read it to them loudly so that they could understand it", and after he read it to them he asked them if they did understand it. Mrs. McCann said, Yes. "I handed it to Mr. McCann, and he took it and read it. * * * I realized—here are some people I have never seen before except the one time I was up there, and I realized they were deeding away this property, and I asked them if they understood what they were doing. I said, 'Do you know you are giving this property away, and that after—this is a deed, an absolute deed, and after you sign it and it is recorded, why the property is no longer yours.' * * * I won't say whether they said, yes, or whether they nodded their heads, but they answered in the affirmative in some way." Mr. and Mrs. McCann signed the deed and the notary certified their acknowledgment. "We were there quite a while." On the second visit—nothing was said the first time—his recollection is that after the papers were signed Mrs. McCann asked Mrs. Riggle "to promise her that she would take care

of Mr. McCann in the event that anything happened to her, and they said they would, and I said, 'If you have any doubt about it we will write a letter setting that forth'; and Mrs. McCann said that that would not be necessary, that if she did not have confidence in these people she would not be doing this."

Mr. Mason understood he "went there to represent Mrs. McCann". While he was there, Mrs. Riggle, after asking the amount of his fee, handed him $35, "which covered two visits, drawing the papers, and included the cost of recording the deed." Mrs. Riggle says she got the $35 for this purpose from Mrs. McCann; Mrs. McCann denies this. On January 9, 1947 Mr. Mason wrote Mrs. Riggle, enclosing a receipt for the $35 and also enclosing the record office receipt for the deed. Mr. Riggle says that on January 7, 1947 Mr. Mason "explained the whole thing to them [Mr. and Mrs. McCann]. For a while I thought Mr. Mason was against me instead of for me because he did try to talk my aunt out of it. That might not sound right but that is the truth. * * * He asked them the different ways, the life tenancy, or just a will, or something like that, and he asked them if they knew what they were doing, and they said, 'yes, sir.' "

Mr. Mason, when asked by the court whether he did not represent Mr. McCann, as well as Mrs. McCann, said, "That I leave up to the court. * * * It was not my understanding it was Mr. McCann's property. It was my understanding he was just there as a husband, that the property had really belonged to Mrs. McCann, that she had bought it and her money was in it, and he was just doing what she told him. * * * That was the impression I received. She was the one that seemed to be—she was wearing the pants. She was the dominating figure."

Mr. McCann says, when he came into the room on January 7, 1947, his wife said she had a paper she wanted him to sign for her "so you will have a home and nothing to worry about after I am dead and gone"; that on account of his wife's condition he would have done

anything; that he was told the paper was "to save our home to keep when Aunt Mollie died, no one could sue us and take the home away from us." The reason his wife gave for having him sign the deed was that if he was going to be sued no one could take the property away from him. He meant "the condition my wife was in when they came over there and started to work on her, they told her she was going to die, and they wanted her to sign these things over [so that] in case of her death I would have a home as long as I lived. They were supposed to move in this house when my wife died. [This he was told after the deed was signed.] They even asked me the room I wanted in the house for my own when they came. They said they would either rent their own house or sell it, and I could have the back bed room upstairs." Mrs. Riggle had told his wife the roomer who had been waiting on his wife, "when my wife died was going to sue me for everything that I owned. That is how they came to get to sign these papers, they claimed, so they could save it." Mrs. McCann says Mrs. Riggle first suggested deeding the property to defendants, "she was to look after him after I was dead and gone, and give him a home and take care of him." Mrs. Riggle said that to her; no one else was present. She says she thought the paper she signed was a will—or "a deed or mortgage, or whatever you call it, for the home to be sold at my death." She also says Mrs. Riggle said the roomer might sue her and take her property.

In December, 1946 Mrs. McCann handed Mrs. Riggle the $2,000 in cash she had in the house. She says, "they scared me. They said some one would come in the house and take it away from me, rob me. * * * They were just to hold it for me." On December 23, 1946 Mrs. Riggle deposited $1,800 in a building association in the names of defendants. She says they were buying a re-frigerator and used some of the money for that. "* * * to eliminate the carrying charges, that is why we took approximately $150 [actually $200]." Mr. Riggle says, "we wanted to put it [the money] in my aunt's name

also, and she said, No, she wanted it in just our name. * * * It was supposed to be my Aunt Mollie's [money]." Later she asked for and got back, first $1,200, then $300, before she went to the hospital. When asked by the court whether he considered he owed his Aunt Mollie $500, he said, No, and when asked why, he said, "it is a pretty hard question. I know she gave it to us at the time. I know she asked me to buy a new car, and if she came to me in the right manner and asked me for it back, and I gave back $1,500, and if she had asked me the same way about the property and not went to a lawyer I would probably have given the property back." Mrs. Riggle, however, says she "most certainly did not" feel they were keeping the money for safe keeping for her aunt; she regarded the $2,000 as a gift. When asked on cross-examination whether she had heard her husband's testimony as to what he thought about the ownership of the $2,000, she said, "Yes, I heard what he said, but there is no man can remember anything or capable of carrying on his own home. A woman has the biggest part to do. You ought to know that."

Plaintiffs have continued in possession of the property and have paid taxes on it. After the deed had been executed Mrs. McCann became suspicious. About two weeks after, she says, she asked Mrs. Riggle "to bring the papers over and read them to me. * * * she said she did not have them yet." The next time she came she said her mother had them locked up in her safe deposit box, "and I got suspicious." After Mrs. McCann got back from the hospital defendants went to see her but were rebuffed at the door. On November 1, 1947 plaintiffs' present counsel wrote to defendants asking them to "get in touch with me immediately" and "have the attorney who handled the recent transfer" do so.

On July 28, 1948 the bill in the instant case was filed. The bill alleges, among other things, that Mrs. McCann, "being fearful of death due to her ill heath and being worried and concerned over the care and maintenance of her * * * husband in the event of her death * * *

without consultation with counsel or discussion with [her husband] or any other friend or relative, attempted to arrange with her niece, [Mrs.] Riggle, for the care and protection of her husband, and as a result of conversations with [defendants], did have an attorney * * * prepare a deed, absolute on its face, to [defendants], which was dated January 7, 1947, and recorded * * *." Defendants in their answer denied the "material allegations" of the paragraph of the bill just quoted and alleged the deed "was the result of a wish by the complainants for your respondents to have said property in appreciation for many years of kindness and loving care by your respondents toward the complainants." On March 28, 1950, the first day of the hearing, during the testimony of the first witness, Mr. McCann, the court asked "Is the defense in this case that this was an outright gift at the time with no strings attached at all?" Counsel for defendants answered, Yes.

Defendants contend (1) that on January 7, 1947 there was no pre-existing confidential relation between plaintiffs and defendants and (2) that, if there was such a relation, defendants have sustained the burden of proof of the fairness of the transfer, especially in view of an enforcable agreement and trust for continued occupancy of the property by plaintiffs and support and care of Mr. McCann after his wife's death.

Manifestly, as defendants say, a confidential relation must exist before a duty can arise out of it or a breach of such duty can occur. But the relation need not exist for any particular time, and the first, as well as later, business transactions between the parties may be governed by the doctrine of confidential relations. That doctrine is not analogous to the apocryphal rule that a dog is entitled to one bite. In *Belote v. Brown*, 193 Md. 114, 129, 65 A. 2d 910, 917, we assumed (without deciding) that the contract and deed in question "created a lifetime relation so inherently confidential that the very negotiation of such a transaction, without independent advice, might constitute a confidential relation". In the

instant case both defendants say this transfer was discussed for eight to twelve months before it was made. As defendants say, mere expression of confidence by one person in another does not create a confidential relation. But the remark ascribed to Mrs. McCann by Mr. Mason is not without significance as indicating reliance on personal confidence rather than on a suggested writing.

Stronger evidence of a preexisting confidential relation on January 7, 1947 is the turning over of the $2,000, more than two weeks before, also after protracted discussions. Regardless of burden of proof, Mrs. McCann's version of this transaction is more persuasive than either of the variant views of the two defendants. Moreover, the action of defendants in depositing this money in their own names, and especially the "taking" of $200 for their refrigerator, show lack of that appreciation of the difference between *meum* and *tuum* which may be expected between persons in such a relation.

We think that on January 7, 1947 a confidential relation existed, and that defendants have failed to sustain the burden of proof of the fairness of the transfer. We have no criticism of Mr. Mason's effort to perform the impossible task of explaining to an elderly illiterate woman, sick in body and worried in mind, the nature of deeds, life estates, remainders and powers and the differences between them. His task might not have been easier if he had realized that Mr. McCann was an owner as well as a husband and had tried to explain that the absolute ownership of the surviving husband could not be reached by a judgment for services against the wife's estate. Mr. McCann was not even present at Mr. Mason's first visit, and probably heard little at the second. Reading a deed is not a legal education for a third grade graduate. It may be hard to believe that Mrs. McCann was as confused as she says she was. It is also hard to say that she had any understanding at all of the legal questions involved in what she was doing.

After the institution of the instant case and before the hearing, in four cases we sustained transfers against attack by or in the right of the grantors, wholly or partly on the ground that the transfers were supported by enforceable agreements or trusts to care for the grantors for life. *Hoffman v. Rickell,* 191 Md. 591, 62 A. 2d 597; *Belote v. Brown, supra; Brandenburg v. Harshman,* 193 Md. 104, 65 A. 2d 906; *Ex parte Miles,* 193 Md. 620, 69 A. 2d 268. On the facts the *Belote* case was the clearest, as the grantor under advice of independent counsel was doubly protected by reservation of a life estate and by a written contract for care and support in *consideration of the deed.* In the *Brandenburg* and *Miles* cases the plaintiffs argued that the disposition we eventually made of those cases amounted to the making of new contracts by the court for the parties. For the reasons indicated in the opinions we thought, and still think, that argument was untenable. In more than one respect those cases are distinguishable from the instant case. In those cases there was part performance by the grantees of immediate obligations to care for the grantors; in the instant case the alleged obligation to care for the husband was wholly executory, to be performed only after the death of the wife. Moreover, in those cases the real moving parties were not the grantors, but expectant heirs, including a newly acquired wife. In the instant case we think this defense is an afterthought, not supported by the evidence. Perhaps the present positions of both plaintiffs and defendants are somewhat inconsistent with their pleadings. But plaintiffs in the bill did not allege that defendants' "representations" amounted to an enforceable contract or trust or seek performance. Defendants utterly denied these allegations and at the hearing asserted that the transfer was "an outright gift with no strings attached at all". The present contention seems to have developed later at the hearing, when the tide seemed to be running against defendants.

We think the decree below was right on the law and the facts. As the case essentially turns on the facts, we should not reverse unless convinced that the judge was clearly wrong.

*Decree affirmed, with costs.*