MORTON, INDIVIDUALLY AND AS ADMINISTRATRIX, ET AL. *v.* THOMAS

[No. 131, October Term, 1950.]

624

*Decided May 16, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Walter V. Harrison* and *Eugene A. Alexander, III,* for the appellants.

*Max Sokol,* with whom were *Michael F. Freedman, Mano Swartz, Deeley K. Nice* and *Dickerson, Nice & Sokol* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a bill by a daughter, the administratrix, and a son, to annul two contemporaneous deeds of leasehold property, from their mother, the intestate, and their step-father, tenants by

the entireties, to a straw man and from the straw man to the step-father for life, with full power of disposition for his own benefit, with remainder to another daughter, plaintiffs' sister, defendant.

The intestate, Betsye Spraggins, was in 1946, as mentioned in Crownsville State Hospital records, an "eighty-years-old" negro. She could not read or write. She was married twice, first to a man named Watkins, who died, second to Boston Spraggins. By her first marriage she had eight or ten children. Four sons and four daughters survived her. Bessie, one of the daughters, is, and apparently always has been, feeble-minded. There were no children of the second marriage. On January 19, 1927 Boston and Betsye Spraggins acquired by deed the leasehold property 539 North Carey Street, subject to an annual ground rent of $99. They lived there until he died on May 16, 1945, at the age of about sixty-five. On March 22, 1945 the deeds now in question were executed, and apparently promptly recorded. Betsye died on February 2, 1947. On September 7, 1944 she was committed, on the certificates of two physicians that she was "insane", to Crownsville State Hospital, and on September 24, 1944 was "discharged against medical advice". On April 29, 1946 she was again committed, on certificates of the same physicians, to the same hospital, where she remained until she died there.

The bill in this case was filed on September 23, 1947. The amended bill alleges that at the time of executing the deed Betsye and Boston "were in an infirm and enfeebled condition and unable because of their physical and mental condition to care for themselves properly"; the mind of Betsye "was in a seriously impaired condition"; and the mind of Boston "was so weakened by a sickness from which he was shortly to die that he was easily subject to be imposed upon"; defendant "prevailed upon her infirm parent and step-parent to execute the * * * deed by the exercise of undue influence and by the abuse of the confidential relationship which existed between her and her parents * * * and she thereafter

kept the execution of the * * * deed a secret"; "but for the fraudulent obtention" of the deed by the defendant, the Carey Street property "would have become part of the estate" of Betsye. The bill prays (1) that the deed be declared null and void, (2) that defendant be enjoined from alienating the property and (3) general relief. The case was heard on bill, answer and testimony taken in open court.

Substantially no questions of law regarding confidential relations are presented except questions of *quantum* and burden of proof, particularly how far meagre evidence for plaintiffs can be eked out by any burden of proof upon defendant or presumption against her. In this court plaintiffs are represented by different counsel from their counsel at the trial. Their present counsel disclaim responsibility for the meagre evidence. Defendant's counsel, politely but not disinterestedly, says the defect was in plaintiffs' case, not in the presentation of it. We need not and cannot pass upon such an issue. Nor can we ignore lack of evidence, whatever the cause.

On the question of mental incapacity, which is not even distinctly alleged in the bill, there is no testimony of any witness, expert or non-expert. Plaintiffs offered in evidence the Crownsville State Hospital records relating to Betsye Spraggins, which comprise fifty pages of the transcript and parts of which constitute sixteen pages of plaintiffs' appendix. If we assume, without deciding, that under the statute which permits admission of hospital records in evidence (Acts of 1929, ch. 517; 1933, ch. 179; 1947, ch. 663; Code, Supp. 1947, Art. 35, sec. 68), and which we have construed broadly (*Bethlehem-Sparrows Point Shipyard v. Scherpenisse,* 187 Md. 375, 380-381), 50 A. 2d 256, 260, mental incapacity at the time a record is made is an "act, transaction, occurrence or event" which may be proved by such a record, nevertheless the statute itself provides that all the circumstances of the making of the record may affect its weight, and we have held that a record may be admissible in evidence and yet legally insufficient to prove a material fact.

*Beverly Beach Club v. Marron,* 172 Md. 471, 475, 192 A. 278.

When Betsye Spraggins was at the hospital in September, 1944 for seventeen days, the record on September 24th shows, "Diagnosis: Diabetic Delirium. Discharged: Only Against Medical Advice. * * * She was admitted in a delirium, but under treatment improved to the point that she could be taken care of in a general hospital. At this time she was showing no mental symptoms. We advised the family of her serious physical condition and that we were making arrangements to have her transferred to a General Hospital in Baltimore City. The husband, however, decided that he wanted to take her home and that he would take her to a general hospital. * * * He did promise to see that she was placed in a general hospital." A record on September 17th shows, "Patient is fully able to carry on a logical conversation"; also "* * * the Examiner is inclined to think that this [manifestation of a quarrelsome disposition] is a paranoid condition".

In 1946 the record on April 29th shows, "* * * patient looks weak and suffering, physically very sick. * * * She is quieter than on her first admission, more composed, more friendly, and tries to do her best during this interview. She gets upset again, though in a milder form than previously, when she talks about being locked up here, and she threatened to sign her house over to the Court if she would be kept here. However, some minutes later she has forgotten what she had said. Stream of Mental Activity—Is coherent and relevant. She is fully able to lead a logical conversation as far as her memory defects do not interfere, but she talks very circumstantially. * * * Her memory for past and recent events is so very much defective that she mixes up the names of her children and is not able to say who lives with her. Diagnosis—Senile Psychosis." One of the commitment certificates says, "* * * Physical Defects: Senile. Mental Condition: Patient is an impulsively behaving negress lacking judgment. Physical Condition

Began: 3 years ago. First Symptoms: Impulsive anti-social behavior." The other says, "Physical Defects: Senile changes. Mental Condition: Wanders out and gets lost. Sets fires. Fights people. Destructive. Picked up by the police several times. Present Condition Began: Two years. First Symptoms: Loss of memory."

The hospital record contains a letter dated August 30, 1945 from a Baltimore lawyer to the superintendent of the hospital and the superintendent's reply dated September 4, 1945. The lawyer said he had a "legal paper" that he desired Betsye Spraggins to sign, but "the party who will receive the paper" desired to know whether she "is competent at this time to sign and acknowledge legal papers", and asked the superintendent's opinion on this question. The superintendent replied that he had "not seen her since the date of discharge, which is a year and am unable to give any opinion whatever in reference to her competency". It would seem that inquiry through this lawyer might have elicited evidence on the question of mental incapacity. The record does not show any result of such an inquiry or whether any such inquiry was made.

The superintendent in effect said that the 1944 record was medically insufficient to support any opinion as to competency in September, 1945. We hold it legally insufficient to support any such inference as to March 22, 1945. On the question of mental incapacity plaintiffs have the burden of proof.

The 1946 record likewise is legally insufficient to support an inference of mental incapacity on March 22, 1945. Evidence of subsequent incapacity may be admissible, but legally insufficient to show incapacity at the time in question. *Kelley v. Stanton*, 141 Md. 380, 397, 118 A. 863. *Cf. Belote v. Brown*, 193 Md. 114, 121, 65 A. 2d 910, 913-914. The two commitment certificates, different from each other and from the hospital diagnosis, cannot be pieced together with the hospital diagnosis so as to support an inference that a senile psychosis had existed for two or three years or at any particular time before

September, 1946. As to the weight and legal sufficiency of this record evidence, we cannot shift responsibility to Judge Moser but we reach the same conclusion he reached.

There is no evidence whatever of mental incapacity on Boston's part or of fraud or (properly speaking) undue influence on anyone's part. Plaintiffs rely principally upon abuse of confidential relationship and upon presumption or burden of proof on that subject. The testimony is noteworthy for what it does not show about the facts.

The administratrix will be referred to as plaintiff, the other plaintiff as co-plaintiff. Plaintiff and defendant are both married. After her marriage, plaintiff left the Carey Street home. She says she lived in the next block and was at the house every morning and night, to help, when Boston and Betsye "got sick". Plaintiff worked out, defendant did not. Defendant left home when she married, but says she came back in 1938 when her sister (presumably Bessie) and her mother were "ailing", and "after they had gotten better I went into my own home". She came back again when Boston "was taken sick" in 1945. Apparently she and her husband have been there ever since. Bessie has continued to live there and to be cared for by defendant. Co-plaintiff has not lived there since April, 1944. He married and left. Another brother, Samuel, lived there and still lives there and pays board. About March, 1945 Boston went to Johns Hopkins Hospital and was there about two weeks. The nature of his illness and the cause of his death are not shown. After Betsye died, defendant borrowed $1,500 on mortgage on the house, $500 to pay for the funeral, and apparently $1,000 to pay a prior mortgage.

Plaintiff says her mother and step-father had full confidence in all the children and treated them all alike and well. She "always said when she was well, and after she got sick even in Crownsville, she said, 'If I die I want everything I have sold and divided up among my children'."

The lawyer who prepared the deeds says he went to Carey Street. "I remember that, if I am not mistaken someone was sick in bed, and they asked me to prepare deeds, or asked me to transfer a deed over——." He saw defendant there, but the talk was out of her presence. He talked with whoever it was that was in bed, he does not recall who it was. Boston and Betsye were the people he had spoken to; he says that only because he sees their names on the deed. "If I am not mistaken, some years ago Spraggins and his wife purchased this property, and I put it through, and that was a long time ago, and later on I think they called me for this particular transaction. To tell you whether they are the same people or not, frankly, I do not remember." He "assumed they were Mr. and Mrs. Spraggins" he was "called to to execute the deed". He had put through the original transaction.

Defendant testified, without objection, that she did not have anything at all to do with the drawing of the deed, she did not know the lawyer, did not call him to draw the deed, and Boston and Betsye did not talk to her about it before the deed was drawn. She did not have any conversations with them about the deed. "Mama did not tell me anything about what they were going to do. She just told me to be a good girl and some day she would surprise me." [The last sentence was stricken out by the court.] When defendant first learned of the deeds or their terms, by whom and just when they were left for record or withdrawn from the record office, the evidence does not show.

If we were to indulge in surmise, our guess might be that Boston, who worked for Bethlehem Steel Company or for a railroad at Bethlehem Steel Company, bought the property in the first instance and sent for the lawyer to prepare the deeds now in question. We might even guess that he possibly thought that after his death Betsye and her daughter Bessie would be better cared for if the property were defendant's than if it were Betsye's. If he did think so, he was justified by the

event. If the property were sold and the proceeds divided among the eight children, every one would get practically nothing and there would be nothing left toward support or care for Bessie. Any such guesses would be no more than guesses, the second more flimsy than the first. The alternative that failure to reserve a life estate to Betsye was mere oversight, due to assumption that she would not survive Boston, who was much younger, would be more plausible unless Boston was (as he seems to have been) ill and in bed at the time. In any event we cannot erect on surmise a new case for plaintiffs. They sue defendant for imposing upon Boston and Betsye. We cannot imagine for them an entirely different case against defendant as beneficiary of imposition by Boston upon Betsye. There is no evidence of any imposition by Boston on anyone.

We may assume that defendant occupied a confidential relation toward Boston and Betsye and that she would have the burden of proving the fairness of any transaction by which she procured from them any gift or benefit. There is no evidence that she procured anything from them or engaged in any transaction with them. Devises and legacies frequently, conveyances occasionally, are made without procurement or even without previous knowledge on the part of the recipient. Knowledge and procurement, or at least particpation, doubtless may be inferred from circumstances. In this case there is no evidence, direct or circumstantial, of participation or previous knowledge.

If we assume that the facts and circumstances of this case are so unusual that the trier of facts would be at liberty to disbelieve defendant's uncontradicted testimony, the fact is that Judge Moser did not disbelieve it. He says, "I have a picture of this sixty-five year old colored man who was very determined and who worked up until a short time before his last sickness. He apparently was determined and afraid, or did not like hospitals, and wanted to be home, not quite realizing that the hospital could have helped him. I think the

burden has been met by all the surrounding circumstances as well as the testimony of this woman. I do not believe there are any outstanding circumstances to impeach the statements of this woman. I observed her and I believe what she said after observing her and listening to her testimony. I feel there was a total lack of anything to impeach it." We have no disposition to disbelieve this uncontradicted testimony, which Judge Moser, who saw and heard the witness, believed. We find no procurement by defendant of any transaction upon which to base a burden of proof of fairness. But if we overlook the lack of basis for such a burden, we agree with Judge Moser that the burden (which we think does not exist) has been met.

*Decree affirmed, with costs.*