RICE ET AL. *v.* HIMMELRICH ET AL.

[No. 187, September Term, 1959.]

*Decided April 11, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*G. C. A. Anderson* and *Wilfred T. McQuaid,* with whom were *Anderson, Barnes, Coe & King* on the brief, for the appellants.

*Joseph Bernstein* and *Frank A. Kaufman,* with whom were *Lawrence F. Rodowsky* and *Frank, Bernstein, Gutberlet & Conaway* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

A bill of complaint to set aside deeds of certain real estate dated October 13, 1954, from a sister, Fannie Rice, to a brother, Nathan Rice, was filed by a nephew and two grand-nephews of the sister, now deceased. The chancellor set aside the deeds on the ground that there was a confidential relationship between the parties, and that "the respondent has not satisfied this court that the transaction was fair and equitable in all respects, untainted by undue influence, and the free and voluntary act of the grantor." The appeal is from that decree. The appellees abandoned here the contention raised in the court below that the decedent, Fannie Rice, was incapable of executing a valid deed on October 13, 1954.

The grantor Fannie Rice died, unmarried, on October 1, 1956, at the age of eighty-six. She was the daughter of Augustus and Rebecca Rice, a well-to-do couple who had a place of business on Aliceanna Street until his death in 1901. Another daughter, Elizabeth, was the mother of Alfred R. Himmelrich, Sr., and the grandmother of Samuel K. Himmelrich and Alfred R. Himmelrich, Jr., the three appellees. By 1938 only Fannie, her brother Nathan, and her brother Emanuel, were surviving of her generation. Neither Nathan nor Emanuel ever married. Emanuel died on February 15, 1952. For the previous ten years he had shared an apartment with his sister, Fannie, at the Riviera Apartments, where she had resided for some thirty-five years, and took care of all her business affairs. Her relationship with her brother Emanuel was always harmonious. Her relationship with Nathan was described as "tempestuous". On December 8, 1950, she conveyed five properties on Aliceanna Street to Nathan without consideration. At that time she was being

advised by her brother, Emanuel, and the deeds were drawn by the family lawyer, Bayard Williams, Sr., now deceased. Nathan sold the properties in 1952 for $20,000, and did not account to her for the proceeds. Nathan was questioned extensively about this transaction at the trial, although the validity or propriety of these conveyances was not put in issue under the pleadings. The chancellor found his testimony vague and misleading. Nathan was ninety-one years of age at the time of trial, and of a somewhat irascible disposition. He insisted that the properties belonged to him, regardless of the state of the title. Fannie had acquired title to four of the properties under the will of her mother, who in turn had acquired them under her husband's will. The fifth property was acquired from a trustee in an equity proceeding. A ground rent on one of the properties was conveyed to her by Nathan in 1946. Nathan testified that the properties had been given him by his father in his lifetime for services rendered without adequate compensation in the conduct of the business. He paid for the property purchased from the trustee. He always collected the revenues from these properties, and paid expenses. Fannie never complained about this. The appellees contend that Fannie and Nathan fell out when she learned she had deeded him the properties. He admitted that there was a quarrel, but denied that this was the cause.

In the latter part of 1951, Emanuel became seriously ill, and Mr. Himmelrich, Sr., took over the management of Fannie's affairs. This continued until August, 1952. Mr. Himmelrich then suggested that she open an agency account at the Safe Deposit and Trust Company (now Mercantile-Safe Deposit & Trust Co.). This was done. She executed a will in October, 1952, under which a trust was created out of the residue. The Trust Company and Mr. Himmelrich were named as executors and trustees. Income of the trust was to be paid equally to the three Himmelrichs and Nathan, during the lives of Nathan and Alfred, Sr., and the survivor of them. After their death, the corpus was distributable to the great-nephews. On January 1, 1954, Nathan and Fannie became reconciled.

In March, 1954, Fannie suggested to Mr. Grasty of the

Trust Company that she would like him to meet her brother Nathan; that he had an estate larger than her own, and might want to avail himself of the services of the Trust Company. A meeting was arranged, attended by Mr. Grasty, Fannie, Nathan, Alfred, Sr., and Bayard Williams, Jr., who had taken over the role of family lawyer upon his father's death. According to the testimony, Nathan did most of the talking and his attitude was critical and even truculent. He claimed that the charges for management were excessive, and that he, with the aid of Bayard Williams, Jr., could handle Fannie's affairs more economically. A few days later, Fannie formally closed the agency account. Thereafter Mr. Williams collected the rentals and other income of her estate under Nathan's supervision. It was shown that all collections were deposited in her bank accounts, and statements rendered to her. Once a month Mr. Williams drew a check for $1,500, payable to Fannie. Fannie executed powers of attorney to Mr. Williams and Nathan, to draw on her bank accounts. Nathan paid all her bills and expenses, including the wages of her cook, companion, maid and chauffeur.

In August, 1954, Fannie executed a new will. It recited that she had theretofore provided for Alfred, Sr., by *inter vivos* deeds. This was apparently a reference to a deed she executed to him without consideration in 1946, conveying the property on McCulloh Street where he conducted his oil business. The value of this property was said to have been some $23,000. Under the residuary clause of the will the residue was left in trust for Nathan for life, with remainders to her two great-nephews, Samuel and Alfred, Jr. Nathan Rice and Bayard Williams, Jr., were named as executors, and Mr. Williams as trustee. A caveat has been filed to this will. In late 1954 and early 1955, Fannie gave $10,000 in cash to Samuel Himmelrich and his wife. Nathan drew these checks. He testified it was Fannie's idea. He cautioned her about giving money away while she was alive, but she insisted. She made other cash gifts to Alfred, Jr.

We come, then, to the only transaction now under attack. In August, 1954, Fannie consulted Mr. Williams about transferring the Zell property, 1358-1368 West North Avenue, to

Nathan. She mentioned the fact that she had previously deeded the McCulloh Street property to Alfred, Sr. Mr. Williams suggested that an outright gift would not be wise, and mentioned certain tax problems. However, at her repeated insistence, he later prepared two deeds which she executed on October 13, 1954. There was a conveyance to a straw man, and reconveyance to her for life, remainder to Nathan. She retained full power of disposition, *inter vivos,* but not by testamentary appointment. She executed the deeds drawn by Mr. Williams in his office. He testified he did not tell Nathan about the transaction at that time. Nathan testified that Fannie never discussed the matter with him.

We may assume, without deciding, that a confidential relationship existed between Fannie and Nathan, arising out of the fact that he was transacting all her business affairs and managing her estate. It is well settled that where there is a confidential relationship, "the burden is on the grantee to show that the transfer was the deliberate and voluntary act of the grantor and that the transaction was fair, proper and reasonable under the circumstances." *Masius v. Wilson,* 213 Md. 259, 265, and cases cited. See also *Piraino v. Betka,* 218 Md. 548, 557. We think the appellant met that burden.

There is no direct evidence that Nathan exercised any influence whatever upon Fannie to bring about the execution of the deeds in question. He was an unmarried man of independent means, whose life expectancy was not great, and the motive sometimes found in cases of this sort would seem to be wholly lacking. Moreover, the direct testimony that Fannie made substantial cash gifts to her great-nephews, contrary to Nathan's advice, tends to rebut any inference that he was in a position to dominate her will in disposing of her property as she pleased. It also tends to rebut the appellees' contention that her retention of a power of disposition *inter vivos* was illusory because of Nathan's dominance. There is no evidence to indicate that she sought the advice of Mr. Williams at Nathan's suggestion. She went to him on several occasions by herself, and never mentioned that she had even discussed the matter with Nathan. There is no evidence beyond mere speculation that the transfer was not her deliberate and volun-

tary act. It was not unnatural that she should wish to make a substantial gift to her only surviving brother and closest relative, with whom she had been reconciled, in preference to her nephew and great-nephews, on whom she had bestowed other favors.

The labored attempt to show that there was some impropriety in Nathan's acquiring from her the Aliceanna Street properties in 1950 falls of its own weight. Even if Nathan's explanation of that transaction, on the basis of a family understanding, was not wholly candid, it has little relevance here. A few years before she had conveyed more valuable property to her nephew. If the conveyance of the Aliceanna Street properties was the cause of the rift between Fannie and Nathan, that rift had been healed. Although Alfred, Sr., attributed the rift to that cause, he never demanded an accounting from Nathan when he took over the management of her affairs, which would have been the proper thing to do if he believed she had been imposed upon. Nathan denied that that was the cause of the rift, and there is no evidence that Fannie ever complained to anyone about it. Her explanation to Mr. Grasty and others was simply that Nathan had been rude to her.

The chancellor stated in his opinion that "there is no evidence that Fannie acted upon independent advice, other than that she consulted her brother's own lawyer." The fact of independent advice, although not indispensable, is an important consideration. See *Williams v. Robinson,* 183 Md. 117, 121. *Masius v. Wilson, supra.* We think, however, that Mr. Williams' advice was independent, and that the aspersion is unwarranted. There is no evidence that Mr. Williams was under a general retainer from Nathan. The mere fact that he had been previously employed by various members of the family, and that he had been employed by Nathan to collect rents and assist in the management of her estate, would hardly disqualify him from advising her about the disposition of her estate, or from drawing her will and the deeds under attack. The evidence indicates that he fully explained the legal effects of what she proposed, and,

in fact, that the retention of a life estate and power of disposition *inter vivos* was his suggestion.

On the issue of fairness, it seems appropriate to observe that in this case, as in many other cases of this sort, the appellees seek to draw invidious inferences from the mere fact that there was a change from prior dispositions disappointing to their hopes and expectations of bounty. But, of course, testators and grantors have a perfect right to leave their property to whom they please, however disappointing to relatives the disposition may be. "Fairness" in this context does not require exact apportionment between prospective heirs. The burden upon a grantee is to show that the grant was not unreasonable or improvident. Here the grantor did not strip herself of her property. She did not deprive herself of a penny of income during her life, and she retained a complete power of disposition over the property during her life. Cf. *Piraino v. Betka, supra* (p. 557). The remainder interest alone was granted to Nathan. The Zell property, which the appellees say is worth some $136,000, was a substantial part of her estate, but she left some $155,000, to pass under her will. We cannot find on the record that the gift of the remainder in the Zell property to her closest relative was unreasonable under the circumstances. It was certainly not improvident.

*Decree reversed and bill dismissed,*
*costs to be paid by the appellees.*