942 A.2d 736

**Diane M. FIGGINS**

v.

**William Andrew COCHRANE, Personal Representative of the Estate of Robert James Cochrane, Jr.**

**No. 46, Sept. Term, 2007.**

Court of Appeals of Maryland.

Feb. 15, 2008.

William T. Wood (John T. Bell, of counsel, Wood Law Offices, LLC, Rockville), on brief, for petitioner.

Walter W. Green (Daniels & Green, LLC, Carlton M. Green, on brief), College Park, for respondent.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, WILNER, ALAN M. (Retired, specially assigned) CATHELL, DALE R. (Retired, specially assigned), JJ.

BATTAGLIA, J.

Diane Marie Figgins, Petitioner, asks this Court to review various decisions of Judge G. Edward Dwyer, Jr., of the Circuit Court for Frederick County, who imposed a constructive trust on the home of her deceased father, James Cochrane, Jr., appointed a constructive trustee, and also ordered the trustee to convey the home to Respondent, Mr. Cochrane's Personal Representative, his son, William Andrew Cochrane. James Cochrane died on November 10, 2004, and his probate Estate was valued at $740,103.55, the largest portion, $630,000.00, representing the value of the home. At the time of his death, Mr. Cochrane had four adult children: Robert James Cochrane, III; William Andrew Cochrane, the Respondent; Donna Lynn Giarth; and Diane Marie Figgins, the Petitioner.

Mr. Cochrane executed his Last Will and Testament on November 12, 2001, as well as a Power of Attorney which named Petitioner as his attorney-in-fact on May 26, 2004, and on September 16, 2004, just two months before his death, a codicil to his will that provided Ms. Figgins with the right to occupy the house for three years following his death and with the exclusive right to purchase the residence within 120 days thereafter. After her father fell into a coma from which he would not recover, Ms. Figgins, on November 8, 2004, purportedly using the Power of Attorney, conveyed the property to herself, individually, for no consideration. Mr. Cochrane died on November 10, 2004.

On February 14, 2005, Respondent, in his capacity as Personal Representative of the Estate, filed a Complaint in which he requested that a constructive trust be imposed on the real property, a request with which Judge Dwyer agreed, after a three day trial. The Court of Special Appeals affirmed in a reported opinion, *Figgins v. Cochrane*, 174 Md.App. 1, 920 A.2d 572 (2007), and we granted Ms. Figgins' petition for writ of certiorari. *Figgins v. Cochrane*, 400 Md. 646, 929 A.2d 889 (2007). She raised three questions for our review, which we have renumbered:

1. Did the trial judge apply the correct rule of law that the Petitioner, to overcome the burden, arising out of a confidential relationship, of proving an absence of undue influence, had to prove the transaction was fair when the Decedent, her father, a Certified Public Accountant and retired mortgage banker, acted upon competent and independent advice of his self-selected estate counsel?

2. Did the trial judge correctly interpret the Durable General Power of Attorney as precluding Petitioner, under the circumstances of this case, from following Decedent's estate counsels instructions to sign and record a deed conveying the family residence to herself?

3. Did the trial judge err in refusing to admit the state of mind testimony of Decedent's estate counsel that he was instructed by Decedent to prepare a deed to convey the family home to the Petitioner because his loan to give the Petitioner the equity in the family home had been turned down?

Because the trial judge correctly imposed a constructive trust on the property, found that the Power of Attorney did not grant Petitioner the ability to gift herself the property under the circumstances presented, and refused to admit the proffered state of mind testimony, we affirm.

### Introduction

Ms. Figgins lived with her parents for most of her life. Even after she married and had children, Ms. Figgins, along with her husband, her two daughters, and her granddaughter

lived with her parents. In 1998, Ms. Figgins, her family, and her parents moved into the home at issue in this case, located in Ijamsville, Maryland. Ms. Figgins and her husband lived in a basement apartment, which they had renovated at their expense, while their daughters and granddaughter lived on the second floor of the house, and Mr. and Mrs. Cochrane lived on the ground floor.

In 2000, Mr. Cochrane was operated on for lung cancer, with the result that he became wheelchair bound, and his wife became his primary caregiver. Ms. Figgins, however, assisted her mother around the house, taking her to purchase groceries, as well as taking her father to get haircuts and to doctors' appointments.

In November of 2001, Mr. Cochrane contacted Scott C. Borison, Esquire, in order to secure a will, and thereafter, a meeting occurred on November 12, 2001, among Mr. Cochrane, Mrs. Cochrane, Ms. Figgins and Mr. Borison at which time Mr. Cochrane executed a last will and testament. In the Will, Mr. Cochrane bequeathed Ms. Figgins a 10% interest in Brighter Solutions, LLC, a painting and contracting business which he co-owned,[1] as well as a remainder interest in it. The Will also included a specific provision to recognize monetarily Ms. Figgins' improvements to the family residence:

> I hereby direct that my personal representative hire a certified appraiser to determine the value added to my residence by the improvements made in the basement. An amount equal to the value added to my residence by the improvements made in the basement shall be paid to Diane Marie Figgins. The appraisal must be done with[in] 90 days from my death.

The residuary beneficiary was Mrs. Cochrane, unless she predeceased her husband whereupon it was to be divided among Ms. Figgins and her three siblings.

---

1. The record does not reflect the identity of Mr. Cochrane's co-owner(s).

In early 2004, Mrs. Cochrane's health began to deteriorate so much so that she became incapable of caring for her husband. In March of 2004, Ms. Figgins assumed the responsibility for the care of both of her parents. She took care of the house, and specifically, with respect to her father, fed him, took him to doctors' appointments, church services, for lunches and rides, administered medicines, did laundry, and met with him on a daily basis to review the mail and pay incoming bills.

On May 26, 2004, during another meeting with Mr. Borison, Mr. Cochrane executed a Durable General Power of Attorney, drafted by Mr. Borison, which appointed Ms. Figgins, who was present, as his attorney-in-fact. The last paragraph of the Preamble of the Power of Attorney stated:

> All powers granted in this Power are granted with the understanding that they will be used for my benefit and on my behalf and will be exercised only in a fiduciary capacity.

Section 1.1 gave Ms. Figgins the power to "[s]ell, exchange, convey ... or otherwise dispose of any estate or interest in real property," while Section 1.13 empowered her to make gifts under certain conditions:

> *Gifts.* I give my attorney-in-fact the power to make gifts, grants, or other transfers without consideration, of cash, or other real or personal property (including but not limited to any property then constitution [sic] or included in any revocable trust established by me), either outright or in trust, including the forgiveness of indebtedness in accordance with the provisions in this paragraph.
>
> (a) *Gifts To My Descendants.* Gifts may be made to any one or more of my children and/or other descendants (including my attorney-in-fact, if my attorney-in-fact is one of such persons), either outright or in trust, in such amounts and upon such terms and conditions as my attorney-in-fact, in my attorney-in-fact's sole judgment, may deem to be reasonable. In determining the reasonableness of any proposed gift, my attorney-in-fact shall take into consideration the extent and nature of my assets; the federal transfer taxes that may result from a gift and/or from my death; the

natural objects of my bounty and the federal estate and/or income taxes to which they may be subjected; and my potential need for long-term care, the costs thereof and the possibility of my qualification for any program of public or private benefits to pay for such costs. The fact that I may not have established a gift giving program or pattern prior to the exercise of this power by my attorney-in-fact shall not be considered a manifestation of a purported desire by me not to undertake such a program at a subsequent time.

(b) *Payment of Gift Tax.* My attorney-in-fact may pay any gift tax that may arise by reason of any gift made.

(alteration added).

In August of 2004, Mrs. Cochrane died. Subsequently, on September 16th, Mr. Cochrane, accompanied by his daughter, again met with Mr. Borison to discuss making a codicil to his will, which, in fact, Mr. Cochrane executed. In addition to bequeathing to Ms. Figgins "any household furniture, including any dining room, living room or family room furniture," the codicil included a bequest to her of the exclusive right to occupy and purchase the home for three years after his death, as well as the right to purchase the property for 120 days immediately thereafter:

I hereby bequeath and give the exclusive right to occupy any real property owned by me at the time of my death to Diane Marie Figgins for a period of three (3) years.

\* \* \*

I hereby bequeath and give Diane Marie Figgins the exclusive right to purchase any real property owned by me at the time of my death at any time until a period of not less than 120 days after any exclusive right to occupy expires for the fair market value of the property.

The Brighter Solutions, LLC bequest also was altered to bequeath all of Mr. Cochrane's interest in the business to Petitioner. At this meeting, according to Mr. Borison, Mr. Cochrane asked him about the tax implications of refinancing the house and also told him that he was going to get a loan to

take equity out of the house and give a gift to Ms. Figgins, although nothing else about the loan was discussed.

On October 14, 2004, Mr. Cochrane began hospice care in his home. Ms. Figgins, who continued to reside there, worked closely with the hospice care nurses. Thereafter, on October 26, 2004, Mr. Cochrane, accompanied by Ms. Figgins, met with Mr. Borison in the attorney's office. The details of this meeting are scant, but according to Mr. Borison, Mr. Cochrane informed him that the loan that he was supposed to be getting did not go through.

At some point in time after the meeting, Mr. Borison prepared a deed which would have by its terms conveyed the father's residence to Ms. Figgins, solely. The draft deed was never executed by Mr. Cochrane, however. On November 3, 2004, Mr. Cochrane lapsed into a coma from which he never recovered. On November 8, 2004, Ms. Figgins returned to Mr. Borison's office, signed the deed, which conveyed the property to herself, purportedly under the Power of Attorney,[2] and immediately drove to the Land Records Office to record it.

Mr. Cochrane died two days later on November 10, 2004. Ms. Figgins did not disclose her actions to any of her siblings, until she mailed a copy of the recorded deed to Respondent in December. Thereafter, Respondent filed the present action in the Circuit Court for Frederick County seeking to have the home returned to his father's Estate through the imposition of a constructive trust.

During the trial, Mr. Borison attempted to testify regarding the October 26th meeting during which Mr. Cochrane allegedly informed him that the refinancing of the house did not go through and that he wanted to transfer the property directly

---

**2.** The signature line of the Deed, admitted as Plaintiff's Exhibit 8 at · trial, provides:

  &lt;Diane Marie Figgins&gt; (SEAL)
  Robert James Cochran, Jr.
  By: Diane Marie Figgins, Power of Attorney

to his daughter; objection to this testimony, however, was sustained on hearsay grounds:

[COUNSEL FOR FIGGINS]: All right. What occurred after you met Mr. Cochrane at that point?

[MR. BORISON]: Basically he told me that the refinancing wasn't going to happen, and that he would like to transfer—

[COUNSEL FOR THE ESTATE]: Objection.

[THE COURT]: All right now why isn't this going to be hearsay?

[COUNSEL FOR FIGGINS]: It's hearsay, Your Honor, but again, based on that case it's the intent of—it's not offered to show that the loan didn't go through. It's offered to show what his intention was. He's going to say that, that, I'll proffer that he's going to say that the loan didn't go through—

[COUNSEL FOR THE ESTATE]: Your Honor, I'll object to these continuing—

[COUNSEL FOR FIGGINS]: May I proffer, Your Honor.

[COUNSEL FOR THE ESTATE]:—proffers at this time.

[COURT]: Well if I sustain your objection.

[COUNSEL FOR THE ESTATE]: In the presence of the witness.

[COURT]: Well.

[COUNSEL FOR THE ESTATE]: It's—I know, Your Honor. For the record I object.

[COUNSEL FOR FIGGINS]: Does Your Honor wish a proffer or not?

[COUNSEL FOR THE ESTATE]: Go ahead.

[COUNSEL FOR FIGGINS]: The proffer is that Mr. Borison will say that Mr. Cochrane indicated that the loan didn't go through and that he wanted to transfer the property instead directly to his daughter.

[COURT]: And you're not offering that for the truth of it?

[COUNSEL FOR FIGGINS]: I'm offering it to show his intention. That his intention—

[COURT]: But you're not, you're not—

[COUNSEL FOR FIGGINS]:—as to why he, why he, why he wanted to do that.

[COURT]: All right. Are you offering it for the truth that he intended that this to be a gift to his daughter?

[COUNSEL FOR FIGGINS]: I'm offering it for the truth of his intentions, what his intentions were.

[COURT]: So you are offering it for the truth of it?

[COUNSEL FOR FIGGINS]: That he, that he intended it. That it was a state of mind to provide that to, to providing it to his daughter, yes. It's a state of mind. But it's not, but I'm not offering it for, offering it for the truth the fact that he was, he didn't get the loan. That's just the, that's, we're offering that to establish why he wanted to do what he did.

[COURT]: But you are offering it for the truth of the fact that he wanted to give the property to his daughter?

[COUNSEL FOR FIGGINS]: I'm offering it to establish his intent to give a gift to his daughter yes.

[COURT]: All right,

[Counsel for the Estate]?

[COUNSEL FOR THE ESTATE]: Continue to object on the basis of hearsay. It does not fall under one of these established exceptions, and it's highly prejudicial.

[COURT]: Well—

[COUNSEL FOR THE ESTATE]: It should not be admitted.

[COURT]:—let me say it this way. I'm assuming anything he's trying to put into evidence is highly prejudicial to your case.

[COUNSEL FOR FIGGINS]: Exactly.

[COURT]: But objection's sustained.

At the conclusion of the three-day bench trial, Judge G. Edward Dwyer, Jr. agreed with Respondent and imposed a constructive trust, appointed a constructive trustee, and ordered that the constructive trustee convey the property to the Estate. Specifically, Judge Dwyer found that Ms. Figgin's conveyance of the real property to herself did not come within

the powers enumerated in Section 1–1 of the Power of Attorney because, "[n]owhere does it give the power to gift real property." He also found that Ms. Figgins did not act reasonably in executing the deed to the home to herself under the Gift Section, 1. 13, and that Mr. Cochrane's intention was not to transfer the property to Ms. Figgins as a gift:

1.13 can or does in certain specific instances give the power to gift real property. But when you're gifting to a descendent, which she is, then one has to look at the reasonableness of any proposed gift. Because 1.13(a) says in determining the reasonableness of any proposed gift, my attorney in fact, Ms. Figgins, shall take into consideration the extent and nature of my assets, the federal transfer taxes—I'm not reading each and every word—the natural objects of my bounty and the federal, state, and, and/or income taxes and other matters including potential for long-term care, possibility of my qualification for public or private benefits and things of that nature. Obviously she did not take any of that into consideration because she didn't even know they existed at the time of the transfer because she hadn't read the power of attorney. If she had then she would have realized that with the nature and extent of his assets she would have been removing from his estate, because I'm not sure whether she knew that the codicil said at that time, so therefore I give her the benefit that she didn't know what was in the codicil, that she was removing 85 percent of the assets of the estate and that is certainly to the detriment of the other natural objects of the bounty, the other three children. And we need also to look at the intent of Mr. Cochrane. And as Mr. Green points out, that is very expressly stated in the last, the codicil of the last will and testament exercised on September 16, 2004, less than two months before his death, which gives to first Ms. Figgins the value of the improvements of the residence have to be taken off of the top and it was interesting that the term residence was used rather than real property. Because it was the real property, arguably at the time of his death he'd have no real property. He had a residence, but he had no

real property because of the deed. But they distinguish real property from residence because the one paragraph says residence and that was, Ms. Figgins even testified he died at home and from the residence you have to take off the value of the improvements, which I didn't realize were in evidence but certainly are in evidence, to be $46,000, and then the exclusive right to remain in that real property, now we use the term real property as opposed to residence, is given to Ms. Figgins. Any real property owned by me at the time of my death. She has the right to remain there for three years and then she also has the right to purchase. So, and that's the exclusive right to purchase, after the 120 days after the exclusive right to occupy expires. So she gets three years and then 120 days to purchase. That certainly shows the intent of Mr. Cochrane.

I also look at 1.18, which basically says that when you make transactions they have to be given for at least fair and adequate consideration. Now I think you can give a gift without fair and adequate consideration. But certainly when you're reducing the value of the estate to practically nothing, and I also look at the fact that if this is what Mr. Cochrane actually wanted to do when he went in to see Mr. Borison on October 26th, all he had to do was rather than doing a new deed, which Mr. Borison couldn't do because he didn't have the old deed there, was just do a new, just strike that codicil and give or bequeath to Ms. Figgins the real property. I find that first, the exercise of the power of attorney is not in accordance with the provisions of the power of attorney because under the gift provision, which is the only provision which authorizes a transfer of real property for a gift without consideration, that the attorney in fact had to take into consideration the nature and extent of [his] assets, federal taxes, natural objects of my bounty, and things of that nature. None of that was done. If it had been done it would not have been a reasonable transaction. We have to look at the reasonableness of the proposed gift, taking into consideration all of that. That certainly was not done and there is no reasonableness to this gift.

Judge Dwyer also determined that because a confidential relationship existed between Ms. Figgins and her father, a presumption arose that the gift was unreasonable, which had not been rebutted:

> But I will also determine that there's been conceded that there is a confidential relationship from, with Ms. Figgins and with Mr. Cochrane, and therefore the burden shifts to her to show the reasonableness of a transfer for basically, no value, a no value transfer. And that burden shifts to her by clear and convincing evidence and she has to show the validity of that transfer and in no manner has she met that burden. So both, I find that it's not authorized under the power of attorney because it didn't comply with 1.13 of the power of attorney and because of the confidential relationship the burden is upon her to show validity of a no consideration transfer and that was by clear and convincing evidence. She hasn't met that. The Plaintiff prevails and a constructive trust is granted and basically, with this, I guess it's, what is it, ultimately go that we order a deed back to the estate is ultimately where you go or constructive, really constructive trust is placed on the real estate is what it actually does.

Ms. Figgins noted an appeal to the Court of Special Appeals, arguing that the deed transferring the property to herself was valid, and that the trial judge erred in refusing to admit Mr. Borison's testimony regarding her father's state of mind and intent to transfer the house to her. The intermediate appellate court affirmed in a reported opinion, *Figgins v. Cochrane*, 174 Md.App. 1, 920 A.2d 572 (2007), first concluding that the "dispositive issue" was whether Ms. Figgins had rebutted the presumption that her confidential relationship with her father rendered the transfer invalid. *Id.* at 11, 920 A.2d at 578. Judge Charles E. Moylan, writing for the court, opined that Ms. Figgins had not met her burden and explicated that the "forbidden fruit of the confidential relationship" was that Mr. Cochrane changed his testamentary intent so drastically:

The appellant views much too narrowly the implications of a finding of a confidential relationship. Even granting her factual predicate as to her Father's wishes as of October 26, 2004, that would still have represented a dramatic change from his wishes as expressed in the Codicil of September 16, 2004. *It is that change itself that may have been the forbidden fruit of the confidential relationship. The rest is only detail.* The appellant protests that her conveyance of the real property to herself "was in accordance with the final wishes" of her Father. She ignores the antecedent implication that her Father's "final wishes" may themselves have been the forbidden fruit of the confidential relationship.

The appellant protests that the conveyance of the property was simply the logical alternative when the Father's effort to procure an equity loan failed. *Again, she ignores the antecedent implication that the desire to obtain the equity loan in order to make a gift to her may itself have been the forbidden fruit of the confidential relationship.* A lawyer's advice as to how best to implement the Father's wishes does not necessarily abrogate the presumptively improper provenance of those wishes.

The finding of Judge Dwyer that there was a confidential relationship is unassailable. That relationship created, as a matter of law, the presumption that any largesse exercised by the Father toward the appellant—be it by deed of property or by gift from an equity loan—was improperly induced by the relationship, whatever the modality of the transfer might turn out to be. The burden was cast upon the appellant to rebut that invalidating presumption. Judge Dwyer found that "in no manner has she met that burden." Judge Dwyer was simply not persuaded, and there was evidence to support that non-persuasion. That there might also have been some evidence in the case pointing in the other direction is beside the point. It was clearly a question of fact for the fact finder. Judge Dwyer's conclusion in that regard cannot, therefore, be said to have been clearly erroneous.

*Id.* at 14–15, 920 A.2d at 580 (emphasis added). Additionally, the court iterated that Ms. Figgins was not authorized by the Power of Attorney to "gift" the house to herself without taking into account the factors defined in the document, which she had not done. *Id.* at 21–22, 920 A.2d at 584.

In analyzing the state of mind exception, Judge Moylan articulated the "Tripartite Utility of the State of Mind Exception" in Maryland Rule 5–803(b)(3),[3] by which he identified three temporal aspects of such evidence: the past, present and future states of mind. In identifying that the proffered evidence from Mr. Borison regarding Mr. Cochrane's intention to deed the house to his daughter was future-oriented and offered to prove conduct by one other than the declarant, Judge Moylan stated that:

> In all of the forward-looking uses of a present intent to prove a future act or to interpret a future act, there is the identity of person between the hearsay declarant and the future actor. Although some states permit a declarant's statement of intent to prove not only the declarant's future action pursuant to that intent but the future action of another person as well, Maryland does not.

*Id.* at 40, 920 A.2d at 595. As a result, the intermediate appellate court concluded that Mr. Borison's testimony regarding Mr. Cochrane's intent was inadmissible because "whatever he may have intended to do, he never did it." *Id.* at 43, 920 A.2d at 597.

---

**3.** Maryland Rule 5–803(b)(3) states:
> The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:
> 
>         \*      \*      \*
> 
> [(b)] (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

## Discussion

Ms. Figgins argues that the Circuit Court erred in imposing a constructive trust on the property because the deed that she executed as attorney-in-fact, which transferred the property to her, was valid. With respect to the confidential relationship issue, she contends that she rebutted the presumption of undue influence because her father, a retired certified public accountant and comptroller of a bank, was represented by independent counsel of his choice. She also asserts that she only signed the deed at the direction of Mr. Borison, her father's attorney, so that her father's interests were protected.

As to the Power of Attorney, Ms. Figgins argues that she was empowered to sign the deed and convey the property to herself. She also contends that she was empowered to execute the deed under the Power of Attorney because she was told to do so by Mr. Borison.

Additionally, Ms. Figgins asserts that the trial court erred in refusing to admit the state of mind testimony of Mr. Borison that he was instructed by Mr. Cochrane to prepare a deed in order to transfer the property to her, because the statements fall within the state of mind exception to the hearsay rule, Maryland Rule 5–803(b)(3).

Conversely, Respondent contends that the Circuit Court was correct in imposing a constructive trust on the property because the deed transferring the property to Ms. Figgins was invalid. Respondent argues that Ms. Figgins has not rebutted the presumption of undue influence created by her confidential relationship with her father and that the transfer of the home was the result of her undue influence.

With respect to the Power of Attorney, Respondent asserts that the Power of Attorney did not expressly authorize the gift of the property to Ms. Figgins, but rather permitted a transfer by gift only upon consideration of the various delineated factors which Ms. Figgins did not do.

Finally, Respondent argues that the "future" state of mind exception in Maryland Rule 5–803(b)(3) only applies when the

statement is offered to prove the occurrence of the intended act by the declarant; here, he asserts, because the hearsay statement was not offered to prove an action taken by Mr. Cochrane, but rather one of Mr. Borison, the statement is inadmissible.

## Standard of Review

In the first two questions presented, Ms. Figgins challenges the trial court's finding that she did not overcome the burden, arising out of the confidential relationship between her and her father, of proving an absence of undue influence and that she did not act reasonably within the exercise of the Power of Attorney when she transferred the property to herself for no consideration. We review the factual findings of the Circuit Court for clear error, observing "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8–131(c). *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657, 676, 922 A.2d 509, 521 (2007); *Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 394, 761 A.2d 899, 911 (2000); *Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915, 923 (1999). "If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous." *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 33, 930 A.2d 304, 323 (2007); *YIVO Inst. for Jewish Research v. Zaleski*, 386 Md. 654, 663, 874 A.2d 411, 416 (2005); *Solomon v. Solomon*, 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004).

## The Confidential Relationship

In this action, the trial court imposed a constructive trust on the home because Judge Dwyer found that a confidential relationship existed between Ms. Figgins and Mr. Cochrane and that she did not rebut the attendant presumption of undue influence. A constructive trust is a "device used by [a court] to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees*, Section 471 (2d. ed.1978). *See also*

*Grimes v. Grimes,* 184 Md. 59, 40 A.2d 58 (1944). It is imposed on property in a number of circumstances, one being where the holder of legal title of a property, the "dominant party," was in a confidential relationship with the prior owner, the "trusting party." *See* Bogert at Section 482. If a confidential relationship is breached or abused, with the result that property was transferred from the trusting party to the dominant party, a constructive trust may be ordered. *See Grimes,* 184 Md. at 64, 40 A.2d at 61; *Williams v. Robinson,* 183 Md. 117, 119, 36 A.2d 547, 549 (1944).

We have iterated that when a "parent on account of old age and infirmity relies heavily upon the child for care and protection or for guidance in business affairs, then there exists a confidential relationship where the child acts as a guardian for the parent...." *Williams,* 183 Md. at 120, 36 A.2d at 549. *See also Myers v. Myers,* 185 Md. 210, 44 A.2d 455 (1945). In *Treffinger v. Sterling,* 269 Md. 356, 305 A.2d 829 (1973), we stated some of the factors that should be explored to determine whether a confidential relationship exists between a parent and a child:

> Among the factors to be examined in determining whether this relationship has come into being are the parent's advanced age, his physical debility, his mental feebleness, and his dependence on his child. None of these factors is necessarily conclusive and each should be given that weight which is warranted by the circumstances then present. Normally it is the minor child who relies heavily upon his parent for care and protection or for guidance in business affairs so that a confidential relationship exists between them with the duties running from the adult to the minor. It is only when, as a result of debility or feebleness, a parent becomes dependent on his child for aid and counsel, that a confidential relationship is re-established....

*Id.* at 361, 305 A.2d at 832 (citations omitted).

In the case *sub judice,* the trial court found that a confidential relationship existed between Ms. Figgins and her father. The evidence reflected that Ms. Figgins had lived with

her parents for most of her life. In 2004, Mr. Cochrane turned seventy-two years old, and was confined to a wheelchair. As a result of his physical debilitation, Mrs. Cochrane and Ms. Figgins were his primary caretakers. After Mrs. Cochrane's health began to deteriorate, Ms. Figgins assumed the primary role of Mr. Cochrane's caretaker, feeding him, taking him out for doctor's appointments, church services, lunches and rides, administering medication, doing laundry, as well as reviewing mail and paying bills. Ms. Figgins occupied this intensely intimate role for the final seven months of Mr. Cochrane's life. As a result, we conclude that the trial court's finding as to the existence of a confidential relationship was not clearly erroneous.

Because a confidential relationship existed between Mr. Cochrane and Ms. Figgins, a presumption arose that the transfer of the house was the result of Ms. Figgins' undue influence on Mr. Cochrane, and the "heavy" burden of showing the fairness of the transaction shifted to Ms. Figgins. *See Sanders v. Sanders,* 261 Md. 268, 276, 274 A.2d 383, 388 (1971); *Williams,* 183 Md. at 120, 36 A.2d at 549. To rebut the presumption, the party receiving the benefit, Ms. Figgins, must "show the fairness and reasonableness of the transaction," *Sanders,* 261 Md. at 276, 274 A.2d at 388, and demonstrate that the transfer was "the free and uninfluenced act of the grantor, upon full knowledge of all the circumstances connected with it and of its contents." *Upman v. Thomey,* 145 Md. 347, 360, 125 A. 860, 865 (1924); *Kerby v. Kerby,* 57 Md. 345, 350 (1882).

Before us, Ms. Figgins argues that she rebutted the presumption of undue influence created by her confidential relationship with her father because her father was represented by an attorney, Mr. Borison, who had been chosen by her father. She also contends that she signed the deed only after being instructed to do so by Mr. Borison, who was acting as her father's agent.

In *Rice v. Himmelrich,* 222 Md. 234, 159 A.2d 647 (1960), we explored whether the existence of independent advice

negated undue influence when a sibling transferred property to her brother prior to her death. Nephews challenged the transaction because the recipient brother had taken care of the decedent's business affairs and had lived with the decedent before her death. After determining that a confidential relationship existed between the decedent and her brother, we held that the brother had rebutted the presumption of undue influence because the transfer did not "strip [the decedent] of her property," and because the decedent acted upon the advice of an attorney when she deeded the property to her brother. *Id.* at 240, 159 A.2d at 651. We explicated:

> The fact of independent advice, although not indispensable, is an important consideration. We think, however, that Mr. Williams' advice was independent, and that the aspersion is unwarranted.

*Id.* at 240, 159 A.2d at 650–51 (citations omitted).

In *Belote v. Brown,* 193 Md. 114, 65 A.2d 910 (1949), a mother had retained a life estate in her home but transferred the remainder to the tenants living in a basement apartment. Her daughter challenged the transaction based upon undue influence, resulting from the facts that the tenants lived with the mother and had promised to take care of her. We assumed for the purposes of discussion that a confidential relationship existed between the mother and the tenants and concluded that the tenants had rebutted the presumption of undue influence because the mother retained a life estate in the property and had the benefit of independent advice of counsel relative to the remainder. *Id.* at 129, 65 A.2d at 917.

Also, in *Colburn v. Ellers,* 160 Md. 104, 153 A. 14 (1931), after a father had retained a life estate in his home, but deeded the remainder to one of his children, the other children challenged the transfer based upon undue influence, because the daughter had then cared for the father after he became paralyzed. We assumed for purposes of discussion that a confidential relationship existed between the father and the daughter and held that the daughter had rebutted the presumption of undue influence because, among other things, the

deed was drafted by an attorney and was executed after independent advice:

> The deed was prepared by a lawyer, of the grantor's own selection, at his own direction, after he had been fully advised as to its purpose and effect, and executed in the presence of his lawyer, a notary public, his son James B. Colburn, his two daughters, Margaret and Della, William Ellers, the husband of Margaret, Walter H. Myers, a friend who had no possible interest in the controversy, and Dr. James J. Murphy, his attending physician.

*Id.* at 113, 153 A. at 18.

In the case principally relied upon by Ms. Figgins, *Gaggers v. Gibson,* 180 Md. 609, 26 A.2d 395 (1942), a father deeded the family home to his daughter for the amount of indebtedness on the property, less than one quarter of its value. The father's other children challenged the deed, contending that it was the result of undue influence on the part of the daughter who had assumed control of her father's affairs after he had become both physically and mentally disabled. After determining that a confidential relationship existed between the father and daughter, we concluded that the daughter had not rebutted the presumption of undue influence, in part, because the father did not receive competent and independent advice:

> "The existence of the confidential relation creates a presumption of influence which imposes upon the one receiving the benefit the burden of proving an absence of undue influence by showing that the party acted upon competent and independent advice of another, or such facts as will satisfy the court that the dealing ... was had in the most perfect good faith on his part and was equitable and just between the parties."

> It is beyond doubt that William Thomas Gibson was influenced by his daughter Emma, one of the beneficiaries of the transaction. He had no advice from any source which would enable him to understand the full force and effect of his act. The representative of the building association explained only the effect, without suggesting any one of several other

arrangements whereby the old man would not lose his entire property. It is reasonable to believe that such a small loan on property worth more than four times the amount of the loan, could be transferred to a straight loan whereby the interest and taxes only would have to be paid annually, or, a part of the property, it was made up of seventeen lots, sold for enough to pay the indebtedness, leaving the home clear for the old man. Also, all of the property, it seems possible, could have been sold for far more than the indebtedness, leaving a sum of money ample for the old man.

Under all the circumstances of this case, as disclosed by the evidence, and in accordance with the settled law in cases like this, we are convinced the transaction was unwarranted and unfair, and that a constructive fraud was perpetrated.

*Id.* at 613–14, 26 A.2d at 397–98 (citations omitted).

Ms. Figgins argues that because Mr. Cochrane did have independent advice from Mr. Borison, she has rebutted the presumption of undue influence that the daughter in *Gaggers* failed to do. Unlike in *Gaggers,* however, although Mr. Cochrane may have had the benefit of independent advice, he never executed the transfer. The trial court determined that the property transfer was the result of undue influence on the part of Ms. Figgins and that she had not rebutted the presumption. In those cases in which we have found that the presumption of undue influence is rebutted by the existence of independent advice, that advice has been provided to the grantor and the grantor executed the transfer. Here, however, Mr. Cochrane never signed the deed. In fact, the last instrument he signed was a codicil to his will, which the trial court found reflected his last intentions, wherein he gave Ms. Figgins the right to remain in the house and purchase it for three years after his death, as well as the right to purchase the property for 120 days immediately thereafter. We conclude, therefore, as did the Court of Special Appeals, that the trial court's finding that Ms. Figgins had not met her burden to prove the validity of the transfer, was not clearly erroneous.

## The Power of Attorney

Ms. Figgins argues, nevertheless, that she was empowered by the Power of Attorney to sign the deed and convey the property to herself. Respondent disagrees and contends that Ms. Figgins was not authorized to gift the property to herself under the Power of Attorney because she did not consider the various factors delineated in the Gift Section, 1.13. The trial court found that although Section 1.13 of the Power of Attorney would have permitted the transfer of the property as a gift to Ms. Figgins, she was not authorized to make the gift thereunder because she did not adhere to its provisions. The Court of Special Appeals agreed and concluded that this finding was not clearly erroneous. We agree.

Powers of attorney, which create a principal-agent relationship, are written documents by which one party, a principal, appoints another as attorney-in-fact and confers upon the latter the authority to perform certain specified acts on behalf of the principal. *King v. Bankerd,* 303 Md. 98, 105, 492 A.2d 608, 611 (1985). Moreover, powers of attorney are frequently used to transfer real property. We have had occasion to address the issue of whether a power of attorney authorizing the agent to "convey, grant, bargain and/or sell" the principal's property, in fact, authorized the agent to make gift transfers. In *King v. Bankerd,* after iterating the " 'well settled' rule ... that powers of attorney are 'strictly construed as a general rule and [are] held to grant only those powers which are clearly delineated'," *id.,* quoting *Klein v. Weiss,* 284 Md. 36, 61, 395 A.2d 126, 140 (1978) (alteration in original), we concluded that a power of attorney would include the power to make a gift of the property if the power "(1) is expressly conferred, (2) arises as a necessary implication from the conferred powers, or (3) is clearly intended by the parties, as evidenced by the surrounding facts and circumstances." *Id.* at 107, 492 A.2d at 612–13.

Because Section 1.1 of the Power of Attorney, to "[s]ell, exchange, convey ... or otherwise dispose of any estate or interest in real property," does not expressly authorize the gift

transfer, Ms. Figgins must rely on the language of Section 1.13 of the Power of Attorney to bulwark the gift of the property to herself:

>**Gifts.** I give my attorney-in-fact the power to make gifts, grants, or other transfers without consideration, of cash, or other real or personal property (including but not limited to any property then constitution [sic] or included in any revocable trust established by me), either outright or in trust, including the forgiveness of indebtedness in accordance with the provisions in this paragraph.
>
>(a) *Gifts To My Descendants.* Gifts may be made to any one or more of my children and/or other descendants (including my attorney-in-fact, if my attorney-in-fact is one of such persons), either outright or in trust, in such amounts and upon such terms and conditions as my attorney-in-fact, in my attorney-in-fact's sole judgment, may deem to be reasonable. In determining the reasonableness of any proposed gift, my attorney-in-fact shall take into consideration the extent and nature of my assets; the federal transfer taxes that may result from a gift and/or from my death; the natural objects of my bounty and the federal estate and/or income taxes to which they may be subjected; and my potential need for long-term care, the costs thereof and the possibility of my qualification for any program of public or private benefits to pay for such costs. The fact that I may not have established a gift giving program or pattern prior to the exercise of this power by my attorney-in-fact shall not be considered a manifestation of a purported desire by me not to undertake such a program at a subsequent time.
>
>(b) *Payment of Gift Tax.* My attorney-in-fact may pay any gift tax that may arise by reason of any gift made.

(alteration added).

■ The trial court found that Ms. Figgins' exercise of the Power of Attorney to gift the house to herself was not in accordance with the provisions of Section 1.13 "because under the gift provision, which is the only provision which authorizes a transfer of real property for a gift without consideration,

that the attorney in fact had to take into consideration the nature and extent of [his] assets, federal taxes, natural objects of my bounty, and things of that nature. None of that was done." The Court of Special Appeals agreed, as do we. Ms. Figgins did not take into consideration any of the delineated factors, as she admitted at trial. Moreover, during her deposition, which was read into the record at trial, she expressly stated that she did not take into consideration "tax consequences," nor her father's general "estate plan," in choosing to execute the Power of Attorney.

Ms. Figgins contends, nevertheless, that she was empowered to execute the deed because she was told to do so by Mr. Borison, her father's attorney, who, she argues, acted in her father's stead as the principal when he instructed her to sign the deed. However, Mr. Borison himself was not authorized to sign the deed and so could not direct its execution. It is well settled that an attorney, acting as another's agent, "has not the power or authority to bind his principal by signing a contract for him, unless he is authorized so to do." *Strawn v. Jones*, 264 Md. 95, 99, 285 A.2d 659, 662 (1972); *Daskais v. Kline*, 188 Md. 541, 551, 53 A.2d 289, 293 (1947). Although an attorney may be an agent for a client, agency to execute a document agreeing to convey or conveying a fee interest in real property requires written permission. *See* Maryland Code (1974, 2003 Repl.Vol.), Section 4–107(a) of the Real Property Article ("Every power of attorney executed by any person authorizing an agent or attorney to sell and grant any property shall be executed in the same manner as a deed and recorded...."). *See also Citizens' Fire Insurance, Security and Land Co. v. Doll*, 35 Md. 89 (1872), wherein a deed purporting to convey property was offered to validate the transfer. The deed, however, was not executed by the property owner but by an attorney; neither was a power of attorney produced, nor was it recorded among the land records. We determined that the deed was inadmissible:

> [U]nless the powers of attorney ... were so attested, acknowledged and recorded, the deed is of no validity. It is only by the power of attorney that the real owner is

> connected with the conveyance, and it is by and through the medium of such power that title is transferred. The deed of itself is without operation, and the recitals in it can prove nothing either as against the real owner or third persons. The court was in error, therefore, in admitting the deed in evidence.

*Id.* at 103. *See also* 4 Herbert T. Tiffany, *The Law of Real Property* 468–69 (3d ed. 1975) ("The owner of land may transfer it, not only by himself executing the instrument of transfer, but also by empowering another so to do in his absence.... A written instrument by which one is authorized to act as the agent of another, in connection with the transfer of land, as in other connections, is frequently, indeed ordinarily, referred to as a power of attorney.... But without reference to such a common-law requirement of a seal, which obviously involves a requirement of a written instrument, the statutes of most of the states expressly require such an authority to be in writing, and some require it to be under seal."); 4 *American Law of Property: A Treatise on the Law of Property in the United States* 745 (1952, 1977 Supp.) (stating that any private conveyance of property can be made through the agency of an "attorney in fact" but that "[t]here is of course the necessary prerequisite that there be a power of attorney from each principal who thus executes the conveyance"); Christopher G. Tiedeman, *The American Law of Real Property* 814 (3d ed. 1906) ("It requires, however, to enable an agent to execute a deed for his principal, a power of attorney under seal, the rule of agency being that the power must be of the same grade of instrument as that which the agent is to execute."); 1 Robert J. Devlin, *The Law of Real Property and Deeds* 333 (3d ed. 1911) ("It is a general rule that a person cannot sign a deed for and as another's agent, unless authority has been given to him under seal."); John G. Hawley, *A Treatise on the Law of Real Property* 526 (4th ed. 1910) ("An agent to sell real estate cannot execute a deed unless he has a power of attorney under seal.").

Here, although Mr. Borison may have been Mr. Cochrane's agent, he was not expressly authorized to execute the deed.

Therefore, Mr. Borison did not have the ability to direct Ms. Figgins to execute the deed.

### The State of Mind Exception to the Hearsay Rule–Maryland Rule 5–803(b)(3)

During trial, Mr. Borison was asked questions about the October 26, 2004 meeting between himself and Mr. Cochrane, at which Ms. Figgins was present, and began to recount what Mr. Cochrane told him about his intentions with respect to the property:

> [COUNSEL FOR FIGGINS]: All right. What occurred after you met Mr. Cochrane at that point?
>
> [MR. BORISON]: Basically he told me that the refinancing wasn't going to happen, and that he would like to transfer—
>
> [COUNSEL FOR THE ESTATE]: Objection.

Counsel for Ms. Figgins then proffered that Mr. Borison would testify that Mr. Cochrane indicated that the loan did not go through and that he wanted to transfer the property instead directly to his daughter. Judge Dwyer sustained the objection and concluded that, because the proffered statement was offered for the truth of the matter asserted, it was hearsay and inadmissible.

Recently, in *Hall v. University of Maryland Medical System Corp.*, 398 Md. 67, 919 A.2d 1177 (2007), we iterated the appellate standard of review for hearsay evidentiary issues:

> Generally, the standard of review with respect to a trial court's ruling on the admissibility of evidence is that such matters are left to the sound discretion of the trial court and unless there is a showing that the trial court abused its discretion, "its ruling [ ] will not be disturbed on appeal." The application of that standard, however, "depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or *on a pure conclusion of law.*" If "the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling *de novo.*"

Under the Maryland Rules, hearsay must be excluded as evidence at trial unless it falls within an exception to the hearsay rule. Thus, a trial court's decision to admit or exclude hearsay ordinarily is an issue of law and, as discussed above, we review decisions of law *de novo*.

*Id.* at 82–83, 919 A.2d at 1186 (citations omitted) (emphasis and alteration in original).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Maryland Rule 5–801(c), and generally, subject to a variety of exceptions, "hearsay is not admissible." Maryland Rule 5–802. One of those exceptions is a statement of a then existing mental or emotional condition of the declarant, as articulated in Maryland Rule 5–803(b)(3), which states in pertinent part:

The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

[ (b) ] (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

■ In order to side-step the ruling of the Court of Special Appeals that correctly articulated that Maryland law does not permit testimony regarding the forward-looking aspect of the state of mind of a declarant when the declarant takes no further action after making a declaration, *see Figgins,* 174 Md.App. at 23–43, 920 A.2d at 585–97, Ms. Figgins contends that the trial judge erred because the proffered statement was admissible to show the state of mind of Mr. Borison, her father's attorney, rather than her father.

We, however, have concluded consistently that evidence of a "forward-looking" state of mind is admissible only to show that the declarant, *not the hearer*, subsequently acted in accord with his or her stated intention. *See* Maryland Rule 5–803(b)(3). *See also Maryland Paper Products Co. v. Judson*, 215 Md. 577, 139 A.2d 219 (1958) (an employee was injured outside of his place of employment, and we held that his statement that he was going to work and that on the way, he was going to pick up a gear wheel for his job, was admissible to prove that he did those things and was acting within the course of his employment when the accident occurred); *Tittlebaum v. Pa. R. Co.*, 167 Md. 397, 174 A. 89 (1934) (we determined that a boy's statement that he was going to toss a brick at a train in order to break a window on the train was admissible to prove that the boy subsequently threw the brick and broke a window on the train); *B. & O.R. Co. v. State*, 81 Md. 371, 32 A. 201 (1895) (we concluded that a statement made by an individual, that he was going to Washington D.C., was admissible to prove that the individual went to, and was lawfully at, the train station).

That statements of the intention of one person cannot be used to prove the basis for another's conduct is well-grounded in our jurisprudence and that of our intermediate appellate court. In *Duvall v. Hambleton & Co.*, 98 Md. 12, 55 A. 431 (1903), a mother's estate sued her son claiming that the decedent had lent money to her son to buy stock and that the son had agreed to assign the stock as collateral for the loan. The administrator sought to testify regarding statements made by the mother with respect to her intent to make the loan in exchange for the assignment of the stock. We concluded that such testimony was inadmissible hearsay because the mother's statement of intent could not be admitted as proof of the son's conduct:

> This comes within the description of hearsay evidence. It was the declaration of the deceased in her own favor and offered now in her own interest. If Mrs. Baldwin were alive and a party to the suit she would have been competent to testify to the transaction about which she was speaking-that

is to what was said and what was done between the parties thereto to show what the transaction really was, and could have called witnesses to do the same; but surely it would not have been competent for her to call the appellant or any other witness to show that she had expressed an intention to make a contract as evidence tending to fasten an obligation upon other parties. No peculiar circumstances have been shown to take this offer of testimony out of the ordinary rule.

*Id.* at 17, 55 A. at 433. *See also Zaleski,* 386 Md. at 674, 874 A.2d at 422 ("Under Md. Rule 5–803(b)(3) a statement of intent, offered to prove the declarant's future action, is admissible as an exception to the hearsay rule."); *Johnson v. State,* 38 Md.App. 306, 314, 381 A.2d 303, 308 (1977) (statements offered to prove the future actions of a codefendant were inadmissible). A declarant's statement of intention may not be used to prove the subsequent actions of another because "the hearsay dangers of perception and memory are present.... [A] declarant may be insincere; for example, the declarant may be concocting a 'cover story' for his or her true intentions or falsely boasting of a relationship with the other person." 6A Lynn McLain, *Maryland Evidence* 206 (2d ed.2001).

Therefore, as the Court of Special Appeals concluded in the present case, actions taken by individuals other than the declarant are irrelevant to the state of mind exception; "[T]he statement of intent is admissible to prove the declarant's future actions, not the future actions of someone else." *Figgins,* 174 Md.App. at 38, 920 A.2d at 594. If the declarant takes no further action based upon the stated intention, as Mr. Cochrane failed to do, the statement of intent exception is not applicable. *Id.* at 42–43, 920 A.2d at 597.

For the reasons stated herein, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**